STATE OF NORTH CAROLINA v. FOREST DENZIL McGUIRE, ALTON
WAYNE RUFF, AND RONALD HAL WELLMAN

No. 57

(Filed 20 April 1979)

1. **Criminal Law § 92.5— outbursts by one defendant—severance properly denied**

The trial court did not err in denying the motion for severance made by two defendants on the ground that outbursts by a third defendant deprived them of a fair and impartial trial, since the trial judge, when possible, immediately removed the jury from the courtroom when an outburst occurred and admonished the jury not to deliberate on the incident; when it became apparent that defendant would continue to disrupt the proceedings despite the court's warnings, he was removed from the courtroom; at that time the court told the jury to disregard the whole matter, and they unanimously indicated that they could do so; and in his final charge to the jury the judge instructed them not to allow defendant's behavior to influence their decision in any way.

2. **Criminal Law § 92.5— reference to unrelated crime by defendant—severance properly denied**

Contention by one defendant that his motion to sever should have been allowed because evidence of an unrelated crime committed by him was brought out was without merit, since the evidence in question was one brief reference to defendant's arrest for an undisclosed crime, and the trial court sustained defendant's objection, struck the evidence, and immediately instructed the jury to disregard it; furthermore, the jury could well have assumed that the arrest referred to was for the crime for which defendant was being tried.

3. **Criminal Law § 101— defendant's statement in jury's hearing—individual polling not required**

Where one defendant stated to another defendant, "Pete, I believe we have got it won" as court was opening one morning, the trial court did all that was required by asking the jury if anyone had heard a statement made by defendant that morning; after three jurors stated that they had, the court told them all to disregard totally any remark in their consideration of the case; all the jurors then affirmatively indicated by raising their hands that they could follow the court's instructions; and the court correctly refrained from having defendant's statement repeated in front of the whole jury, the majority of whom did not hear it, asking each juror individually what he heard, and polling the jurors separately as to any prejudicial effect the statement may have had.

4. **Constitutional Law § 52— five years between offenses and trial—no prejudice shown—no denial of speedy trial**

Defendant was not denied his right to a speedy trial by the more than five year delay between the commission of the crimes charged and the date the indictments were returned, since defendant failed to show any actual prejudice resulting from the delay.

5. **Constitutional Law § 45— right to appear pro se—right not asserted unequivocally**

Where the indigent defendant who had counsel appointed for him repeatedly stated that he wanted different counsel, on one occasion stated that he wanted to represent himself, later apparently acquiesced in appointed counsel, and subsequently behaved at trial in a manner which would have required termination of his self-representation, defendant did not clearly and unequivocally assert his desire to conduct a *pro se* defense, and the court therefore did not err in denying his request to represent himself at trial without questioning defendant at the time he made his vague request.

6. **Criminal Law § 29— mental capacity questioned during trial—no right to psychiatric examination**

The trial court did not err in failing to have defendant examined by a psychiatrist when his capacity to proceed was raised by him at trial since examination by a medical expert is a discretionary matter, and the court did not abuse its discretion in this case.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

APPEAL by defendants from the judgment of *Ferrell, J.* entered in the 14 December 1977 Session of CATAWBA County Superior Court. This case was argued as Number 17 at the Fall Term 1978.

Defendant McGuire and defendant Ruff were each charged, in indictments proper in form, with armed robbery, first degree burglary and conspiracy to commit armed robbery. Defendant Wellman was charged, in indictments proper in form, with conspiracy to commit armed robbery and conspiracy to commit first degree burglary. The cases were all consolidated for trial.

At trial the evidence for the State tended to show the following:

On the night of 1 October 1971 Mr. Clifford (Dock) Hefner, his wife and his son were in their home in Hickory, North Carolina watching television. About 10:15 p.m. a window in the room was suddenly broken, and a masked man was standing outside pointing a shotgun at Mr. Hefner. Other masked men with guns and a knife then burst into the house. Mrs. Hefner stated she thought there were three men in all, but she could not be sure because "they kept coming and going." Ricky Hefner, the son, testified that "[he] saw three men but at the time it sounded like [he] could hear more talking in the other rooms."

The men proceeded to tie the Hefners' feet and hands together behind their backs with wire. They kicked and beat Mr. Hefner and burned him on his rectum and on the bottom of his feet with candles. All Mr. Hefner's teeth were knocked out, and he had a fractured skull. The men kept asking him for his money; Mr. Hefner had $1,200 or $1,300 taken from his wallet that night.

One of the intruders burned Mrs. Hefner on her breasts and pulled her pants down and held a candle to her vagina. They kept smothering her with a pillow and asking her for money. She showed the men where she had previously hidden $180.00, which they took. The men also took three watches and two diamond rings from Mrs. Hefner. At one point she showed the men where she thought her husband had hidden some money in the back-yard.

The men took $50.00 from Ricky Hefner. They burned the eleven-year old boy on his toes and asked him where his father "had the money hid."

Suzanne Hefner, who was Mr. and Mrs. Hefner's seventeen-year old daughter at the time, came home from a date at approximately 12:15 a.m. When she entered the house, a man grabbed her, threw her onto a garbage can in the kitchen and kicked her in the head. After tying her hands and feet with wire, they jerked her pants down and burned her "on my [Suzanne Hefner's] private parts between my legs with a candle." One of them rammed his fingers into her vagina, and they told Ms. Hefner they were going to rape her. The men took money from her wallet and continuously asked her "where the money was."

The men stayed at the Hefner house several hours. None of the Hefners could identify the intruders, however, because they had on masks and raincoats.

Mr. Hefner testified that he used to play poker regularly. On one occasion, while playing with some people he did not know, he had $300 or $400 with him that had gotten wet and had become moldy. One of the men asked him how the money had gotten in that condition, and Mr. Hefner had replied that "it was some that I had hid." Mr. Hefner testified that he in fact did have some money hidden in the yard.

Arthur Edward Williamson, Jr. testified for the State. He stated that in September of 1971 he, the three defendants, Lane McGraw and Hoyt Powell met at defendant Wellman's trailer in Spartanburg, South Carolina. Defendant Wellman told the others about a man named Dock in Hickory, North Carolina who had buried approximately $250,000 in a baby casket in his backyard. Defendant Wellman had stated that someone "very close to him" had given him this information, and that he himself had been at a poker game with Dock who had a money belt that smelled very moldy.

The men then discussed the proposed robbery. The others told defendant Wellman that after it was completed, he would get an equal share of the proceeds. It was never intended that defendant Wellman actively participate in the robbery because "he didn't do that."

A few days before the robbery, defendant McGuire, defendant Ruff, Hoyt Powell and Williamson went to Hickory to look over the Hefner residence. They decided where they would park the cars. They made masks out of pant legs, and they bought raincoats and gloves. The men got a roll of wire that was cut into strips three feet long to be used for tying the Hefners' hands and feet. Each man had a pistol, and the group also obtained a sawed-off shotgun and a .30 caliber rifle.

Late in the afternoon of 1 October 1971 defendant McGuire, defendant Ruff, Hoyt Powell and Williamson left defendant Wellman's trailer in Spartanburg and drove to the Hefner residence in Hickory. Williamson's story as to what happened there was basically the same as the testimony of the Hefner family.

After leaving the Hefner home, the four men returned to defendant Wellman's trailer; however, defendant Wellman was not there. They then divided the $1,500 and the jewelry four ways among themselves. Defendant Wellman was not given a share because "[defendant Wellman] told us that there was Two Hundred Fifty Thousand Dollars and he understood if the money wasn't there he wasn't to get anything and there wasn't enough there to split up with [him]."

Defendant McGuire and defendant Ruff presented no evidence.

Apparently defendant Wellman took the stand on his own behalf; however, that testimony is not in the record before this Court.

The jury found defendant McGuire and defendant Ruff guilty of armed robbery, first degree burglary and conspiracy to commit armed robbery. Each defendant received two life sentences on the substantive charges and ten years imprisonment on the conspiracy charge, all of which were to run concurrently. The jury found defendant Wellman guilty of conspiracy to commit first degree burglary and conspiracy to commit armed robbery; he received ten years imprisonment on each charge, to run consecutively. He was permitted to post $100,000 cash bond on appeal. Defendant McGuire and defendant Ruff appealed by right to this Court on their armed robbery and first degree burglary convictions. We allowed the three defendants' motions to bypass the Court of Appeals on all the remaining convictions.

Additional facts relevant to the decision will be included in the opinion below.

*Lloyd M. Sigman and Devere C. Lentz, Jr. for defendant McGuire.*

*Corne and Pitts, P.A. by Stanley J. Corne for defendant Ruff.*

*Lefler, Gordon & Waddell by Lewis E. Waddell, Jr. for defendant Wellman.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Roy A. Giles, Jr. for the State.*

COPELAND, Justice.

For the reasons stated below, we find the defendants had a trial free from error.

This appeal concerns three defendants who submitted separate briefs to this Court. We will deal first with those assignments of error brought forth by both defendant McGuire and defendant Wellman. A contention made by defendant Wellman alone will then be discussed. Last we will examine those questions presented by defendant Ruff alone.

State v. McGuire

[1]   In their first assignment of error, defendant McGuire and defendant Wellman argue the trial court erred in denying their motions for severance and for a mistrial. The defendants contend they did not receive a fair and impartial trial due to the in-court outbursts of defendant Ruff.

Defendant Ruff made numerous outbursts during defendants' joint trial, many of which occurred while the jury was out of the courtroom. He did, however, disrupt the trial several times in the presence of the jury. He called the witness Williamson a liar three times. As the jury was retiring from the courtroom, defendant Ruff said "Good-bye girl!" on one occasion and "Keep cool. Peace!" another time. After the trial judge sustained one of his objections to a question asked by the State, the defendant made the comment, "Lay in there" to his attorney. As court was opening one morning, defendant Ruff stated to defendant Wellman that "Pete, I believe we have got it won;" however, neither the judge nor a majority of the jury heard this remark. Near the end of the trial, defendant Ruff broke into a tirade of obscenities and blasphemies. At that point, he was removed from the courtroom with his consent.

Several times during the trial defendant McGuire and defendant Wellman moved for a mistrial or for separate trials. The trial court denied these motions, finding that defendant Ruff's outbursts did not prejudice the other defendants and that the jury could disregard them.

It is undisputed that the initial joinder of these three defendants was proper under G.S. 15A-926(b)(2)(b)(1) because all charges against them stemmed from a common scheme or plan. However, G.S. 15A-927(c)(2)(b) states that a severance must be granted "[i]f during trial, . . . it is found necessary to achieve a fair determination of the guilt or innocence of that defendant [making the motion]." We have held that the question whether to order separate trials is within the trial court's discretion, and its decision will not be disturbed on appeal unless it is shown that the movant did not receive a fair trial. *State v. Slade*, 291 N.C. 275, 229 S.E. 2d 921 (1976). Similarly, under G.S. 15A-1061, a mistrial must be declared "if there occurs during the trial . . . conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." This Court has stated that the resolution of

this issue also is within the trial court's discretion. *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976).

There is good reason for appellate courts to defer to the trial judge's determination of these matters. As Judge Parker aptly stated:

"When such an incident involving an unexpected emotional outburst occurs, the judge must act promptly and decisively to restore order and to erase any bias or prejudice which may have been aroused. Whether it is possible to accomplish this in a particular case is a question necessarily first addressed to the sound discretion of the trial judge. 'Not every disruptive event occurring during the course of trial requires the court automatically to declare a mistrial,' and if in the sound discretion of the trial judge it is possible despite the untoward event, to preserve defendant's basic right to receive a fair trial before an unbiased jury, then the motion for mistrial should be denied. On appeal, the decision of the trial judge in this regard is entitled to the greatest respect. He is present while the events unfold and is in a position to know far better than the printed record can ever reflect just how far the jury may have been influenced by the events occurring during the trial and whether it has been possible to erase the prejudicial effect of some emotional outburst. Therefore, unless his ruling is clearly erroneous so as to amount to a manifest abuse of discretion, it will not be disturbed on appeal." *State v. Sorrells*, 33 N.C. App. 374, 376-77, 235 S.E. 2d 70, 72 (1977), *cert. denied*, 293 N.C. 257, 237 S.E. 2d 539 (1977). (Citations omitted.) *See also State v. Nowell*, 156 N.C. 648, 72 S.E. 590 (1911).

It appears that this Court has not had occasion to consider the precise situation present in this case, to-wit: disruptions at a joint trial by one defendant that are alleged to have prejudiced the other defendants. We note, however, that several federal courts have decided cases in which this problem has arisen.

In *United States v. Bamberger*, 456 F. 2d 1119 (3d Cir. 1972), *cert. denied sub nom Crapps v. United States*, 406 U.S. 969, 32 L.Ed. 2d 668, 92 S.Ct. 2424 (1972), four defendants had been jointly tried for and convicted of bank robbery. Two of the defendants disrupted the trial. One of them called two State's witnesses liars,

and he made derogatory remarks to and about the trial judge. Another defendant continually interrupted the testimony of an F.B.I. agent and finally swallowed one of the government's exhibits, a piece of paper. The trial judge instructed the jury to consider the evidence against each defendant separately. In upholding the trial court's denial of motions to sever and for a mistrial made by one of the passive defendants, the court said:

> "This issue presents a delicate balancing of the right of a passive co-defendant to have his cause determined in an atmosphere free of inflammatory speech and gesture, society's interest in speedy trials for those accused of crime, the realities of sound judicial administration, and a consideration of convenience to witnesses. The accommodation of these countervailing considerations is entrusted to the trial judge. So long as he accords the necessary protection to the passive defendant within the parameters of sound judicial discretion we should not disturb his decision. We find no abuse of discretion here." *Id.* at 1128.

In *United States v. Marshall*, 458 F. 2d 446 (2d Cir. 1972), there was a joint trial concerning three defendants charged with bank robbery. One defendant, Guglielmo, directed accusations and obscenities toward the witnesses, the trial judge and the prosecution throughout the trial. At one point he threw a water pitcher at the prosecutor and hurled a chair toward the jury box. During the summation of a codefendant's attorney, Guglielmo cut his wrists with a razor blade, cut his tongue and then apparently attempted to swallow the blade. The two passive defendants moved to sever and moved for a mistrial based on this behavior, but the trial court denied their motions. Finding no abuse of discretion below, the court of appeals noted that "[t]he trial court took great pains to repeatedly and carefully instruct the jury to disregard Guglielmo's trial conduct in determining the guilt of each of the appellants . . . as well as that of Guglielmo himself. There is no reason to assume that the court's instructions were not efficacious." *Id.* at 462. *See also United States v. Smith*, 578 F. 2d 1227 (8th Cir. 1978); *United States v. Bentvena*, 319 F. 2d 916 (2d Cir. 1963), *cert. denied*, 375 U.S. 940, 11 L.Ed. 2d 271, 84 S.Ct. 345 (1963).

Defendant Ruff's conduct in this case is mild when compared to that recited above. When possible, the able trial judge immedi-

ately removed the members of the jury from the courtroom when an outburst occurred, and he admonished them not to deliberate on it. When it became apparent that defendant Ruff would continue to disrupt the proceedings despite the court's warnings, he was removed from the courtroom. At this time the court told the jury to totally disregard the whole matter, and they unanimously indicated that they could do so. In his final charge to the jury, Judge Ferrell again isntructed the jury not to allow defendant Ruff's behavior to "influence your decision in any way when you come to weigh the evidence or determine the issues of guilt either as to defendant Ruff or as to the defendant Wellman or McGuire." Under these circumstances, we cannot say the trial court abused its discretion in denying defendant McGuire's and defendant Wellman's motions for severance or for a mistrial.

[2] Defendant McGuire also asserts that his motion to sever should have been allowed because evidence of an unrelated crime committed by him was brought out at trial during the cross-examination of Williamson by defendant Ruff's attorney. We do not agree.

At one point, defendant Ruff used a prior statement of Williamson to cross-examine that witness. The following exchange took place:

> "Q. Now to read the rest of that part of your statement, did you read this in your statement, 'Williamson advised that the .30 caliber automatic rifle and the .45 caliber pistol that was taken in the robbery of Dock in Hickory were seized by the F.B.I. when Forest McGuire was arrested.'
>
> · OBJECTION.
>
> SUSTAINED.
>
> MOVE TO STRIKE IT.
>
> COURT: Members of the jury, be advised to disregard that portion as to McGuire. Let me see it, sir. Do not consider statement of counsel, members of the jury, or deliberate upon it at any time."

In this instance, the trial court sustained defendant McGuire's objection, struck the evidence and immediately instructed the jury to disregard it. "[W]hen all evidence of a partic-

ular character is stricken and the jury instructed not to consider it, any prejudice is ordinarily cured unless the evidence stricken was so highly prejudicial that its effect cannot be erased from the minds of the jurors." *State v. Barrow*, 276 N.C. 381, 388, 172 S.E. 2d 512, 516 (1970). (Citations omitted.) This one brief reference to defendant McGuire's arrest for an undisclosed crime does not fall within that category. Furthermore, the jury could well have assumed that the arrest referred to was for the crime for which defendant McGuire was being tried. This assignment of error is overruled.

Defendant McGuire and defendant Wellman also argue the trial court erred in allowing the State to ask Williamson certain questions on redirect examination of that witness.

The district attorney asked Williamson, "[D]id you commit any bank robbery or any other type robbery prior to the summer of 1971 whenever you first met these defendants, and I mean Alton Wayne Ruff and Forest Danzil McGuire?" Over defendants' objections, the witness replied that he had not committed any robberies before 1971.

Williamson had been subjected to vigorous cross-examination by defendants during which he admitted committing many crimes, including thirteen bank robberies and six armed robberies. This Court has said:

"After a litigant brings out on cross examination specific acts of an adverse witness for the purpose of impeachment, the party by whom the witness is called may sustain the character of the witness by eliciting from him evidence explaining those acts, or mitigating their effect. This is true even though evidence otherwise inadmissible is thereby introduced." *State v. Minton*, 234 N.C. 716, 724, 68 S.E. 2d 844, 849-50 (1952). (Citations omitted.)

During cross-examination, Williamson testified that "I [Williamson] told him [defendant McGuire] that I read a letter from Foster Sellers to Billy Dawson stating that Wayne Ruff and Foster Sellers and all were mad at Mr. McGuire." On redirect examination the State asked Williamson who is Foster Sellers, and he replied that "he is a bank robber." The defendants complain that the trial court should have excluded this evidence when they

objected to it. It is proper, however, to elicit testimony on redirect examination to explain matters brought out on cross-examination. *State v. Minton, supra.* This argument is without merit.

[3] It was brought to the court's attention by Mr. Allen Bailey, one of defendant Wellman's trial attorneys, that defendant Ruff had stated to defendant Wellman, "Pete, I believe we have got ,it won" as court was opening one morning. The trial judge stated that he did not hear any such comment; however, he heard testimony outside the presence of the jury regarding the alleged statement. Both defendant Wellman's trial attorneys stated they had heard the remark, but Deputy Dellinger, who sat next to the jury box, testified that he did not hear it.

On motions by defendant McGuire and defendant Wellman, the trial judge then questioned the jury as to whether or not they overheard "any statement at the very beginning of the session this morning from any defendant made at that time." Two regular jurors and one alternate juror indicated they had heard "some statement by one defendant." The judge admonished the jury to "not deliberate upon any statement which you may have heard. Do not communicate among yourselves about it. Do not form or express an opinion about it. Cast aside from your mind with regard to your deliberation of this matter in this trial any such statement you may have heard. Do not deliberate upon it in any way, members of the jury." The jury then unanimously indicated that they could follow the court's instructions on this matter by raising their hands.

Although it is somewhat unclear, apparently defendant McGuire and defendant Wellman contend the trial court should have asked each juror individually exactly what he or she heard and should have polled the jurors separately as to any prejudicial effect the statement may have had. We do not agree.

In *State v. Spencer*, 239 N.C. 604, 80 S.E. 2d 670 (1954), a woman entered the courtroom when the judge was absent and, in the presence of the jury, said to the defense counsel, "I told [the prosecutor] I don't know anything about this case. If you put me on the stand, you will be sorry." This incident was brought to the court's attention the next morning. The court made inquiry of the jury, and two jurors indicated they had heard the remark. On ap-

peal, the defendant contended that the other jurors were not given a chance to say whether they had heard the comment or whether they were influenced by it. In overruling this objection, we noted that "[t]he judge asked the jury twice, if any of them had heard the words of Annie Lee Hodges. Only two said they had. The other ten could have spoken up in response to the two questions, if they had heard her remarks." *Id.* at 610, 80 S.E. 2d at 674.

In this case the trial court did all that was required of it. It asked the jury if anyone had heard a statement made by a defendant that morning. After three jurors represented that they had, it told them all to totally disregard any remark in their consideration of the case. All the jurors then affirmatively indicated by raising their hands that they could follow the court's instructions. Furthermore, we think the trial court correctly refrained from having defendant Ruff's statement repeated in front of the whole jury, the majority of whom did not hear it. That action would have served merely to unnecessarily emphasize the remark. This assignment of error is overruled.

[4] Defendant Wellman claims his pretrial motion to dismiss the charges against him should have been granted because he was denied his right to a speedy trial. The basis for his argument is the more than five-year delay between when the crimes in question were committed and when the indictments against him were returned.

In *United States v. Lovasco*, 431 U.S. 783, 52 L.Ed. 2d 752, 97 S.Ct. 2044 (1977), the United States Supreme Court considered "the circumstances in which the Constitution requires that an indictment be dismissed because of delay between the commission of an offense and the initiation of prosecution." *Id.* at 784, 52 L.Ed. 2d at 755, 97 S.Ct. at 2046. The Court reaffirmed its holding in *United States v. Marion*, 404 U.S. 307, 30 L.Ed. 2d 468, 92 S.Ct. 455 (1971), that it is only "a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provisions of the Sixth Amendment." *Id.* at 320, 30 L.Ed. 2d at 479, 92 S.Ct. at 463.

In *Lovasco* the Court went on to determine the applicability of the Due Process Clause to a defendant's charge of unnecessary

preindictment delay. Without setting forth a precise test to be used in every instance, the Supreme Court laid down at least one principle which applies to this case and which defeats defendant Wellman's claim. It was made clear that *actual* prejudice must be shown before the dismissal of charges is necessary. *See also State v. Dietz*, 289 N.C. 488, 223 S.E. 2d 357 (1976).

The only *potential* prejudice defendant Wellman could point out at the pretrial hearing on his motion was "the insurmountable burden of going back." Although he originally had argued that certain witnesses necessary for his defense could not be located, the trial court issued material witness orders pursuant to G.S. 15A-803 for him. Defendant Wellman's only argument to this Court as to the prejudicial effect of the preindictment delay is that "Defendant was harmed by virtue of the fact that he lost evidence and witnesses." There is nothing in the record to support this general allegation; therefore, defendant Wellman's argument must fail. The trial court correctly denied his motion to dismiss the charges against him.

[5] In his first assignment of error, defendant Ruff claims the trial court erred in denying his request to represent himself at trial. We do not agree.

In *Faretta v. California*, 422 U.S. 806, 45 L.Ed. 2d 562, 95 S.Ct. 2525 (1975), the United States Supreme Court made it clear that a defendant in a state court has the constitutional right to conduct his own defense without the assistance of counsel. On that subject this Court has stated that "a defendant, so charged with a criminal offense, has the right, if he so elects, to conduct his own defense without counsel. The services of counsel unsatisfactory to him may not be forced upon him." *State v. Robinson*, 290 N.C. 56, 64-65, 224 S.E. 2d 174, 179 (1976).

In *Faretta*, however, the accused immediately asserted his desire to conduct his own defense, and he never wavered from that position. The Supreme Court noted that "weeks before trial, Faretta *clearly and unequivocally* declared to the trial judge that he wanted to represent himself and did not want counsel." *Faretta v. California, supra* at 835, 45 L.Ed. 2d at 582, 95 S.Ct. at 2541. (Emphasis added.) In this case, defendant Ruff never "clearly and unequivocally" asserted his desire to proceed to trial without his appointed attorney.

On 4 October 1977 defendant Ruff first appeared before the court for his arraignment. At that time the court informed him that "if you do not want a lawyer, you are not required to take one, however in the event that you elect not to take a lawyer, the court would likely appoint a lawyer to assist in the trial of these cases." Defendant Ruff then stated that he wanted the court to appoint him an attorney, and he filled out an indigent form. Mr. Stanley Corne was appointed as his lawyer.

Defendant Ruff's arraignment was continued on 11 October 1977. He pleaded not guilty and at that time asked the court to appoint him a different lawyer because "I [defendant Ruff] cannot reach any agreement with [Mr. Corne]." The defendant added that "I am asking the court to let me defend myself in these cases." The court refused, indicating that Mr. Corne had already been appointed to represent the defendant and that it would not change that decision. Defendant Ruff then repeated that "I am asking for another attorney."

Thereafter, on 24 October 1977, defendant Ruff sent Mr. Corne a letter stating that the two of them had gotten off to a bad start, that the defendant would like to talk with the attorney again and that "after today you can run the show." On 5 December 1977, the day of trial, the court asked defendant Ruff directly if he were "ready to proceed to trial with counsel Stanley Corne." The defendant replied, "Yes, sir."

On 11 October 1977 defendant Ruff twice asked the court to appoint a new attorney to represent him. A defendant's rights do not extend this far.

> "The constitutional right of an indigent defendant in a criminal action to have the effective assistance of competent counsel, appointed by the court to represent him, does not include the right to insist that competent counsel, so assigned and so assisting him, be removed and replaced with other counsel merely because the defendant has become dissatisfied with his services." *State v. Robinson, supra* at 65-66, 224 S.E. 2d at 179. *See also United States v. Young,* 482 F. 2d 993 (5th Cir. 1973).

At the same time defendant Ruff was asking to have new counsel appointed for him, he made one statement to the effect

that he wanted to represent himself. When all the defendant's statements and actions are considered together, it is apparent that he never "clearly and unequivocally" asserted his desire to conduct a *pro se* defense.

Furthermore, the trial court's blanket denial of these ambiguous requests probably meant that it was going to have Mr. Corne at trial, regardless of defendant Ruff's objections, to stand by in case he was asked for or needed. This interpretation is bolstered by the court's original statement to defendant Ruff at the 4 October 1977 arraignment proceeding that even if the defendant did not want counsel, the court would still appoint one to assist him at trial.

> "Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." *Faretta v. California, supra* at 835 n. 46, 45 L.Ed. 2d at 581 n. 46, 95 S.Ct. at 2541 n. 46.

Defendant Ruff's disruptive conduct at trial brings up another facet of this problem. Although these outbursts had not actually occurred at the time of the arraignment, it is in the record by defendant Ruff's attorney that "everybody thought [the proceeding] was going to be . . . an unruly situation." In *Faretta*, the Supreme Court stated that "[t]he right of self-representation is not a license to abuse the dignity of the courtroom," and "the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* The trial court had not only the right, but the duty to consider this possibility, especially since there were two other defendants being tried with defendant Ruff.

> "This actual disruption of the proceedings demonstrated what would have happened during trial if defendant had been permitted to represent himself. . . . His trial would have been a farce. Granting defendant's motion to represent himself would have subverted the orderly administration of justice and jeopardized a fair trial of the issues." *People v. Brown*, 124 Cal. Rptr. 130, 138 (Cal. App. 1975).

Defendant Ruff voiced his desire to proceed without counsel as to part of his defense in the middle of trial. The court denied his request after questioning the defendant thoroughly and after making extensive findings of fact and conclusions of law. The defendant does not contest this ruling and, in fact, he argues that "to have gone part of the way with an attorney and then suddenly be without counsel before the jury would have been highly prejudicial to him."

The better practice in this case would have been for the court to have questioned defendant Ruff at the time he made the vague statement concerning his desire to defend himself. However, in light of all the circumstances of this case—defendant Ruff's conflicting requests, his apparent acquiescence in appointed counsel, his antics at trial which would have required termination of the defendant's self-representation, the *voir dire* conducted by the court later during trial on this same issue and the overwhelming evidence of defendant's guilt—we cannot say the court's failure to question the defendant earlier warrants the grant of a new trial. If it were error, it was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 17 L.Ed. 2d 705, 87 S.Ct. 824 (1967). This assignment of error is overruled.

[6]   Defendant Ruff next claims the trial court erred in not having him examined by a psychiatrist when his capacity to proceed was raised by him at trial. This argument is without merit.

During the course of trial, defendant Ruff's counsel indicated to the court that he had some question as to the defendant's capacity to proceed with trial. The attorney asked one of the county doctors, Dr. John Sinnett, to come to court, observe defendant Ruff during trial and talk with him during recess and after court. The trial judge stated that he would be "delighted" for the doctor to examine the defendant.

The next day, out of the presence of the jury, the court conducted a hearing on defendant Ruff's capacity to proceed. Dr. Sinnett, a general practitioner, was called to testify. He had treated patients with nervous and mental disorders, and he had committed several patients to mental hospitals in the past. The doctor stated that in his opinion defendant Ruff knew right from wrong, understood the nature of the proceedings against him and his own situation in reference to the proceedings and could assist his at-

State v. McGuire

torney in his defense "if he desired to." Defendant Ruff's brother was also called to testify. He stated that he felt there had been "a definite change in [the defendant's] mental processes." After the hearing, the trial court made findings of fact and concluded that the defendant was competent to stand trial.

Defendant Ruff claims the trial court was required to order him examined by a psychiatrist in light of Dr. Sinnett's statement that "the ideal situation [would be] to have a psychiatrist's evaluation done." However, G.S. 15A-1002(b) dictates that when a defendant's capacity to proceed has been questioned, the trial court "[m]ay appoint one or more impartial medical experts to examine the defendant," "[m]ay commit the defendant to a State mental health facility for observation and treatment," and "[m]ust hold a hearing to determine the defendant's capacity to proceed." (Emphasis added.)

Thus, although a defendant has the right to a hearing on his capacity to proceed when that question is properly raised, whether to have a defendant examined by a medical expert is within the trial court's discretion. See State v. Washington, 283 N.C. 175, 195 S.E. 2d 534 (1973), cert. denied, 414 U.S. 1132, 38 L.Ed. 2d 757, 94 S.Ct. 873 (1974). There has been no showing the trial court abused its discretion in this case; therefore, this assignment of error is overruled.

We commend Judge Ferrell for the patience he exhibited under very trying circumstances.

For the foregoing reasons, we find defendants had a trial free from error.

No error.

Justices BRITT and BROCK took no part in the consideration or decision of this case.