STATE OF NORTH CAROLINA v. MARVIN EARL WILLIAMS, JR.

No. 264A90

(Filed 10 September 1993)

### 1. Criminal Law § 762 (NCI4th) — murder — reasonable doubt — instructions

An instruction on reasonable doubt in a prosecution for murder, burglary with explosives, and attempted safecracking was erroneous under *State v. Bryant*, 334 N.C. 333.

**Am Jur 2d, Trial § 832.**

### 2. Homicide § 244 (NCI4th) — murder — premeditation and deliberation — sufficiency of evidence

The evidence was clearly sufficient to support a conclusion that a murder was premeditated and deliberate where defendant carried a knife with him during an attempted safecracking, indicating that he had anticipated a violent confrontation and the need for deadly force; defendant struck the victim numerous times with a heavy object, causing at least three lethal injuries; some of the lethal blows may have been inflicted while the victim was lying helpless on the ground; and there was no evidence to show that defendant was provoked.

**Am Jur 2d, Homicide §§ 437 et seq.**

### 3. Homicide § 279 (NCI4th) — first-degree murder — instructions — guilty if killing occurred during burglary with explosives

The trial court did not err by instructing a jury that it could convict defendant of first-degree murder if it found that the killing had occurred during the commission of a burglary with explosives. Although defendant contended that burglary with explosives is not a crime within the purview of the felony murder rule, the language of the burglary with explosives statute, the statute's history, and the rationale underlying the felony murder rule compel the conclusion that the legislature intended burglary with explosives to be one of the felonies upon which first-degree murder could be premised. N.C.G.S. § 14-17; N.C.G.S. § 14-57.

**Am Jur 2d, Homicide § 442.**

4. **Constitutional Law § 281 (NCI4th) — murder — right to appear pro se — sufficiency of request**

A first-degree murder defendant's right to proceed *pro se* was not infringed where the right was not properly asserted. Although the trial court erroneously based its denial of the right to appear *pro se* on defendant's ability to adequately represent himself, it is apparent that defendant's primary desire was to ensure adequate representation by counsel and that he never took a firm position on whether to proceed *pro se*. Defendant was not denied his right to represent himself at trial because he never asserted that right clearly and unequivocally. Moreover, had defendant been permitted to represent himself based on his equivocal requests, he would now be arguing with some justification that he was denied the right to counsel and the Supreme Court refused to place the trial courts in a position to be "whipsawed" by equivocal requests to proceed without counsel.

**Am Jur 2d, Criminal Law §§ 764 et seq., 993 et seq.**

**Accused's right to represent himself in state criminal proceeding — modern state cases. 98 ALR3d 13.**

5. **Evidence and Witnesses § 1623 (NCI4th) — murder — audio tape recording — authentication**

The trial court did not err in a prosecution for first-degree murder, burglary with explosives and attempted safecracking by admitting a tape recording allegedly containing admissions by defendant where the tape was partially inaudible. The seven-prong test of *State v. Lynch*, 279 N.C. 1, has been superseded by the authentication requirements of N.C.G.S. § 8C-1, Rule 901, under which authentication is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. The State provided such evidence here in the form of testimony by Angelo Farmer that the tape was a true recording of his conversation with defendant and the trial court did not err in failing to make findings of fact in accordance with the *Lynch* test.

**Am Jur 2d, Evidence § 436.**

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

6. **Evidence and Witnesses § 1618 (NCI4th)— murder—audio recording—partially audible—admissible**

The trial court did not err in a prosecution for first-degree murder, burglary with explosives and attempted safecracking by admitting a tape recording allegedly containing admissions by .defendant where the tape was partially inaudible. Authentication is not the only prerequisite to the admissibility of a tape recording; a tape must also be shown to have been legally obtained and to contain otherwise competent evidence. A tape recording which is not sufficiently audible cannot be considered competent evidence. The trial court here found the tape audible enough to be "enlightening to the jury." A tape recording should not be excluded merely because parts of it are inaudible if there are other parts that can be heard.

**Am Jur 2d, Evidence § 436.**

**Omission or inaudibility of portions of sound recording as affecting its admissibility in evidence. 57 ALR3d 746.**

7. **Evidence and Witnesses § 1617 (NCI4th)— murder—audio recording—partially inaudible—interpretation of tape for jury**

There was no error in a prosecution for first-degree murder, burglary with explosives and attempted safecracking where a partially inaudible tape recording was admitted and a witness and the prosecutor were allowed to "interpret" the tape recording for the jury. The witness, Angelo Farmer, testified to defendant's statements from his own knowledge of the conversation, not from listening to the recording, and the prosecutor argued that the tape contained various incriminating statements by defendant. It was up to the jury to decide what defendant said.

**Am Jur 2d, Evidence § 436.**

8. **Evidence and Witnesses § 1686 (NCI4th)— murder—photographs of victim—introduced twice—not repetitious**

The trial court did not abuse its discretion in a murder prosecution by allowing the State to use two photographs showing the victim as found at the crime scene with blood streaked across his face and head to illustrate the testimony of the person who found the body and to illustrate the testimony of the SBI agent who analyzed the crime scene. Although defendant argued that the second showing had no value other

than to inflame the passions of the jury, the republication of the photographs would have been quite useful in illustrating the SBI agent's more detailed testimony. Moreover, there was very little danger of unfair prejudice because the photographs were not nearly as gory as those in *State v. Hennis*, 323 N.C. 279, to which defendant analogizes the case at bar, nor were the photographs presented in a fashion likely to heighten the jury's emotional reaction.

**Am Jur 2d, Evidence § 787; Homicide § 419.**

**9. Evidence and Witnesses § 1263 (NCI4th)— murder—silence when rights read—subsequent statements by defendant and consent to search—implied waiver of rights**

The trial court properly admitted defendant's statements and some boxes seized from him in a prosecution for first-degree murder, burglary with explosives, and attempted safe-cracking where defendant was arrested at a boarding house; defendant was informed of his *Miranda* rights and asked whether he understood those rights; defendant responded that he did but stood mute when asked whether he wished to waive his right to remain silent and whether he wished to waive his right to have counsel present during questioning; someone asked defendant whether anything in the room belonged to him; defendant responded that he owned the boxes on the floor; defendant was then asked whether he would consent to a search of the boxes; and he responded, "yes." Defendant answered the officers' questions free from coercion and after indicating that he understood his rights; these facts are sufficient to justify the trial court's ruling that he impliedly waived his rights.

**Am Jur 2d, Evidence §§ 555-557, 614; Criminal Law § 797.**

Justice PARKER did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Butterfield, J., at the 30 April 1990 Criminal Session of Superior Court, Wayne County, upon a jury verdict of first-degree murder. Defendant's motion to bypass the Court of Appeals as to his conviction of burglary

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

by explosives was allowed by this Court on 13 August 1991. Heard in the Supreme Court 10 February 1992.

*Lacy H. Thornburg, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, for the State.*

*William F.W. Massengale, Barry T. Winston, and Marilyn G. Ozer for defendant-appellant.*

EXUM, Chief Justice.

After a trial in which he was convicted of the murder of Theron Price, of burglary with explosives and of attempted safe-cracking, defendant was sentenced to death. He now raises numerous assignments of error spanning both the guilt-innocence and the sentencing phases of the trial. We find one of these meritorious and therefore grant him a new trial.

I

Defendant introduced no evidence at trial. The State's evidence tended to show the facts narrated below.

In the early morning of 12 February 1989, Lewis Rich, a security guard for Dewey Brothers, Inc., arrived at the company's premises for his 12:30 a.m. to 6:30 a.m. shift to find the guardhouse gate locked. Unable to enter the premises or locate Theron Price, the guard he was scheduled to relieve, Rich telephoned Richard Helms, the company president. Helms arrived shortly and opened the gate. Helms found the door to the payroll office partially open, a light emanating from within, and just outside the office door an acetylene torch and a cart bearing oxygen and acetylene tanks. Helms then summoned the police. Inside the payroll office, the police observed a floor safe illuminated by a gooseneck lamp. There was carbon on the safe's hinges and knob. The police determined that the torch was improperly adjusted, that it would have created a lot of smoke and carbon but would not have cut metal.

Joining the police in a search of the rest of the premises, Helms discovered Theron Price. Lifeless, Price was lying on his back in the steel shed next to the payroll office, and had blood on his face and head. Parallel lines in the dirt indicated he had been dragged into the shed. Various of his possessions, including his time clock, were nearby, as were a yellow hard hat and a

welder's mask. The time clock, hard hat and welder's mask had blood on them. There were cracks in the fiberglass of the welder's mask, and, in the cracks, gray hairs. Also found on the scene were Reebok tennis shoe impressions leading to the building which housed the acetylene torches and related equipment. The lock on the cabinet where the torches were kept had been cut off.

Several days after the discovery of Price's body, an employee of Dewey Brothers named Angelo Farmer reported to his supervisors that he knew the identity of the killer. According to Farmer, he and defendant had discussed breaking into Dewey Brothers and robbing its safe in the early part of February. On 11 February, defendant asked Farmer whether he was "ready to move." When Farmer indicated that he was not, defendant said, "I'm gone. I'm on my move." The next day, after learning of Price's death, Farmer confronted defendant, saying: "Damn man. You killed a man." Defendant said he did not mean to do it. When Farmer remarked that defendant could have tied Price up, defendant replied that he had wanted to but "the man kept coming."

Having revealed this information, Farmer agreed to cooperate with the police. The police furnished him with a tape recording device. Wearing the device, Farmer engaged defendant in conversation about the crimes. During the conversation, defendant said he had tried to break into Dewey Brothers' safe using an acetylene torch he found on the premises. When surprised by the watchman, he had pulled a knife but the guard had "kept coming." He had then taken the guard's time clock and hit him with it "two or three times." Defendant further stated: "I got scared then, but then I thought about the money. I kept checking on him and he had not come back to. I knew I had done killed the m—— f—— then." Defendant had continued to work on the safe and had checked on the guard more than once. When he heard a truck pull up, and later a car, defendant had attempted to wipe away his fingerprints and hide some of the evidence, and had then fled.

The police obtained a warrant based on Farmer's allegations and the tape recording and arrested defendant at a boarding house called the Salem Lodge. The police seized defendant's clothing and some of his possessions. The shoes he was wearing matched the footprints found at Dewey Brothers. Other than the shoes, however, the police obtained no physical evidence tending to link defendant to the crime scene.

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

An autopsy of the victim's body revealed several wounds on the face and head caused by blunt force trauma and a small laceration on each hand. The wounds on the face would have caused mild to moderate pain. The wounds on the head resulted in skull fractures and could have caused death. Two of these wounds would have required the force of a five-pound steel ball dropped from seven to twelve feet. The victim may have been conscious during the infliction of all the wounds, and for two to five minutes thereafter, and may have been hit while lying on the ground. The victim probably lived for five to ten minutes after the fatal blows were struck.

Defendant was convicted of first-degree murder on theories of felony murder, the underlying felony being burglary with explosives, and premeditation and deliberation. He was also convicted of burglary with explosives and attempted safe-cracking. After a sentencing hearing, the jury recommended and the trial court imposed a sentence of death. The trial court also sentenced defendant to thirty years' imprisonment on the burglary conviction, but arrested the attempted safe-cracking judgment.

## II

[1] Defendant contends, and we agree, that the trial judge gave the jury an unconstitutional instruction on the meaning of "reasonable doubt." The challenged instruction, given midway through the jury's deliberations in response to a juror's request for clarification, was taken almost verbatim from *State v. Hammonds*, 241 N.C. 226, 232, 85 S.E.2d 133, 138 (1954). The instruction stated:

When it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied or entirely convinced or to put it another way, satisfied to a moral certainty of the truth of the charge. If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith to a moral certainty in the defendant's guilt, then they have a reasonable doubt, otherwise not. A reasonable doubt as that term is employed in the administration of criminal law, is a[n] honest substantial misgiving generated by the insufficiency of the proof, an insufficiency which fails to convince your judgment and conscience and satisfy your reason as to the guilt of the accused.

## STATE v. WILLIAMS

[334 N.C. 440 (1993)]

In the recent case of *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993), we held that the United States Supreme Court's decisions in *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990), and *Sullivan v. Louisiana*, 508 U.S. ---, 124 L. Ed. 2d 182 (1993), required us to declare an essentially identical instruction violative of the Due Process Clause of the Fourteenth Amendment and plain error warranting a new trial. Our decision in *Bryant* controls this issue and requires that we grant defendant a new trial.

### III

Though the instructional error is dispositive of this appeal, we must also discuss defendant's contention that the trial court should have dismissed the first-degree murder charge for insufficiency of the evidence. Were his contention correct, he would be shielded from further prosecution on this charge by the Double Jeopardy Clause of the United States Constitution. *State v. Silhan*, 302 N.C. 223, 267, 275 S.E.2d 450, 480 (1981). In addition, we will discuss those issues likely to arise again at defendant's next trial.

### A

[2] Defendant contends that the trial court erred in denying his motion to dismiss the first-degree murder charge since there was insufficient evidence of premeditation and deliberation. We disagree.

In measuring the sufficiency of the evidence, all evidence admitted, whether competent or incompetent, must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence and resolving in its favor any contradictions in the evidence. A motion to dismiss is properly denied if the evidence, when viewed in the above light, is such that a rational trier of fact could find beyond a reasonable doubt the existence of each element of the crime charged. *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984); *State v. Sumpter*, 318 N.C. 102, 107-08, 347 S.E.2d 396, 399 (1986).

A killing is "premeditated" if the defendant contemplated killing for some period of time, however short, before he acted. It is "deliberate" if the defendant acted "in a cool state of blood," free from any "violent passion suddenly aroused by some lawful or just cause or legal provocation." *State v. Fields*, 315 N.C. 191, 200, 337 S.E.2d 518, 524 (1985) (quoting *State v. Lowery*, 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983) ). The defendant need not have

been placid or unemotional. Rather, whatever passion he felt must not have been such as to overwhelm his faculties and reason. *State v. Williams*, 308 N.C. 47, 68, 301 S.E.2d 335, 348-49, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983).

Whether a killing was premeditated and deliberate may usually be answered only by resort to circumstantial evidence. *State v. Williams*, 308 N.C. at 68-69, 301 S.E.2d at 349. Among the circumstances generally considered probative on the point, the following are directly applicable to the facts of this case: 1) conduct of the defendant before and after the killing tending to show the requisite state of mind, 2) the dealing of lethal blows after the deceased has been felled and rendered helpless, 3) that the killing was accomplished in a brutal manner and 4) a want of provocation on the part of the deceased. *Id.*

Viewed in the light most favorable to the State, the evidence was clearly sufficient to support a conclusion that the murder was premeditated and deliberate. First, defendant carried a knife with him during the attempted safe-cracking, indicating that he had anticipated a violent confrontation and the need for deadly force. Second, and most importantly, he struck the victim numerous times with a heavy object, causing at least three lethal injuries. Since a number of the blows would have rendered the victim unconscious, some of the lethal blows may have been inflicted while the victim was lying helpless on the ground. This evidence tends to show a conscious decision on the part of defendant to ensure that his victim was dead.

Nor is there any evidence to show that defendant was provoked. Granted, he was surprised by the night watchman, but this fact alone does not justify a conclusion that he lost his capacity for rational thought. In fact, the evidence is all to the contrary. According to defendant himself, he had the presence of mind after felling the victim to resume his efforts to crack the safe and, when the police arrived, to hide various incriminating items and wipe his fingerprints from the scene before fleeing.

We conclude that the trial court did not err in denying defendant's motion to dismiss the first-degree murder charge.

This assignment of error is overruled.

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

B

[3] Defendant next takes issue with the trial court's instruction to the jury that it could convict of first-degree murder if it found that the killing had occurred during the commission of a burglary with explosives. According to defendant, burglary with explosives is not a crime within the purview of the felony murder rule. Defendant did not object at trial. Therefore, were there error in this instruction, defendant would be entitled to no relief unless the error amounted to plain error. *State v. Odom*, 307 N.C. 655, 300 S.E.2d 375 (1983). We hold that the trial court did not commit error. The language of the burglary with explosives statute, the statute's history, and the rationale underlying the felony murder rule, compel a conclusion that the legislature intended burglary with explosives to be one of the felonies upon which first-degree murder could be premised.

It is an elementary principle of statutory interpretation that, "[w]here the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give it its plain and definite meaning." *State v. Camp*, 286 N.C. 148, 152, 209 S.E.2d 754, 756 (1974) (quoting 7 Strong, N.C. Index 2d, Statutes § 5 (1968)). Thus, we must begin our analysis with the language of the statutes in question. N.C.G.S. § 14-17 provides that a murder which occurs during the course of any "arson, rape or a sex offense, robbery, kidnapping, *burglary*, or other felony committed or attempted with the use of a deadly weapon" is punishable as first-degree murder. N.C.G.S. § 14-17 (Supp. 1992) (emphasis added). N.C.G.S. § 14-57 reads as follows:

> Any person who, with intent to commit any felony or larceny therein, breaks and enters, either by day or by night, any building, whether inhabited or not, and opens or attempts to open any vault, safe, or other secure place by use of nitroglycerine, dynamite, gun-powder, or any other explosive, or acetylene torch, shall be deemed guilty of *burglary* with explosives.

N.C.G.S. § 14-57 (1986) (emphasis added).

We note at the outset that the legislature denominated the crime of burglary with explosives a "burglary." The term "burglary" has a technical legal meaning, and we must presume that the legislature intended this meaning absent strong evidence to the

contrary. As the Court stated in *Asbury v. Albermarle*, 162 N.C. 247, 249-50, 78 S.E. 146, 148 (1913):

> [The] rule applicable to the construction of statutes is that when they make use of words of definite and well known sense in the law, they are to be received and expounded in the same sense in the statute. *Adams v. Turrentine*, 30 N.C. 149. In that case *Chief Justice Ruffin* says: 'Indeed, this rule is not confined to the construction of statutes, but extends to the interpretation of private instruments. There are exceptions to it, where it is seen that a word is used in a sense different from its proper one in instruments made by a person *inops consilii*. But that is a condition in which the Legislature cannot be supposed, and, therefore, although the intention of the Legislature, as collected from the whole act, is to prevail, a technical term having a settled legal sense, cannot be received in any other sense, unless at the last it be perfectly plain on the act itself what that other sense is.'

Nor is it "plain on the act itself" that the legislature intended the language of the burglary with explosives statute to be received in any but its technical sense. Burglary with explosives was unknown to the common law. *United States v. Brandenburg*, 144 F.2d 656, 663 (3rd Cir. 1944). Rather, it is a statutory crime, first defined in 1921 N.C. Sess. Laws, ch. 5, in language almost identical to that of the present statute. As noted by *Brandenburg*, the crime "bears little resemblance to the crime of burglary as defined at the common law." *Id.* at 662. Burglary, still a common law offense, is defined as a breaking and entering, in the nighttime, of the dwelling house of another, with intent to commit a felony therein. *State v. Williams*, 314 N.C. 337, 355, 333 S.E.2d 708, 720 (1985). By contrast, burglary with explosives is the breaking and entering, with intent to commit a felony therein, of *any* building, whether during the day *or* night, followed by the requisite opening of or attempt to open any secure place by the use of explosives.

Burglary with explosives, then, much more resembles a felonious breaking or entering, *see* N.C.G.S. § 14-54 (1986), than it does a burglary. This fact makes the legislature's choice of terminology especially significant. In 1921, the crime of breaking or entering was defined by statute as a breaking or entering "*otherwise* than by a burglarious breaking." N.C. Consol. Stat. § 4235 (1919) (emphasis added). We can only surmise that the legislature, having

defined the crime of burglary with explosives in terms almost identical to those of breaking or entering, denominated the crime a "burglary" in order to distinguish it from breaking or entering. That the legislature intended an important distinction between the two crimes is further evidenced by its provision that the crime of burglary "shall be punished as for burglary in the second degree." 1921 N.C. Sess. Laws, ch. 5, § 2. Burglary in the second degree was then punishable by imprisonment "for life, or for a term of years." N.C. Consol. Stat. § 4233. Breaking or entering otherwise than burglariously was punishable by imprisonment for "not less than four months nor more than ten years." N.C. Consol. Stat. § 4235.

Thus, both the language of the statute and its history support a conclusion that the legislature intended burglary with explosives to be considered a species of "burglary." If it is a "burglary," then burglary with explosives must be within the purview of N.C.G.S. § 14-17.

Nor does this conclusion do violence to the rationale of the felony murder rule. Indeed, like the other felonies enumerated in N.C.G.S. § 14-17 — arson, rape, robbery, kidnapping and burglary — the crime of burglary with explosives is inherently dangerous to human life. Using explosives is a highly dangerous activity under the best of circumstances. See Sales Co. v. Board of Transportation, 292 N.C. 437, 442, 233 S.E.2d 569, 572 (1977) (blasting with explosives considered "ultrahazardous activity"). When done inside a building, and without warning to the occupants of the building, or to those who may be nearby, the risk to human life is only multiplied. We can readily conclude that the legislature considered this crime as inherently dangerous as simple "burglary" and therefore deserving of the highest penalty when its commission results in death.

We hold that the crime of burglary with explosives, as defined by N.C.G.S. § 14-57, is a "burglary" within the purview of the felony murder statute. Therefore, the trial court did not err in instructing the jury on felony murder.

This assignment of error is overruled.

C

[4] Defendant next contends that he was denied the right to represent himself. Based on the record summarized below, we find that defendant did not request to proceed pro se with sufficient clarity.

Because the right was not properly asserted, it cannot have been infringed.

On the afternoon of the fourth day of jury selection, defendant informed the judge that he was dissatisfied with his court-appointed counsel, Messrs. Jordan and Braswell. Defendant indicated that his lawyers had not adequately communicated with him about the details of his case, and had failed to provide him with the information (including legal texts) he needed to help defend himself. He also suggested that his case should have been moved to another venue because of negative pretrial publicity. The judge responded that defendant's lawyers were perfectly capable and that it would be impractical at this late stage of the proceedings to substitute other counsel. According to the judge, defendant had only two options. He could either continue with Messrs. Jordan and Braswell, or represent himself. When asked if he wanted to represent himself, defendant answered, "No, sir." The judge reiterated that defendant's lawyers would provide an "adequate defense," and then questioned the lawyers about their representation of defendant.

After his lawyers had spoken, defendant again addressed the court. He said, "You stated that, that there is no other way that I could have no other lawyers . . . But what if I choose to represent myself?" The judge responded that he would consider defendant's request and proceeded to question him at great length regarding his ability to conduct his own defense. Specifically, the judge asked whether defendant was taking drugs or medication, how much schooling he had completed, what his grades had been and whether he had ever studied law. The judge then advised defendant that, given his lack of legal training, he would be at a grave disadvantage in attempting to represent himself against a prosecutor with twenty-five years experience. The judge concluded by asking defendant whether he still wished to represent himself. Defendant responded: "I choose to represent myself." The judge did not rule on defendant's request, but instead adjourned the court so that he could consider the issue for the rest of the afternoon.

The judge opened the next session with another lecture on the dangers of self-representation. The judge reminded defendant that he faced a number of serious charges, including one for first-degree murder, and that he risked receiving the death penalty. The judge then asked defendant again whether he still wanted to represent himself. Defendant responded, "I chose to represent

myself." At this, the judge took a brief recess and then renewed his questioning regarding defendant's ability to represent himself. This time the judge went into greater depth regarding defendant's education and grades, and also asked about defendant's age, IQ, public speaking ability and previous experience in representing himself. The following exchange then occurred:

> MR. WILLIAMS: I understand the situation that I have chosen to represent myself. It is not that I would like to represent myself but if I could get a full new complete set of lawyers representing me and I would feel fair with that representation. I would like to continue on with my trial if I was able to receive things that I am entitled to have concerning my trial or evidence that is brought up against me and so on, state witnesses and so on.
>
> THE COURT: You are saying that if your lawyers would furnish to you everything that you ask for —
>
> MR. WILLIAMS: Concerning my trial.
>
> THE COURT: Then you would be willing to let them stay on your case?
>
> MR. WILLIAMS: Yes, sir.

The discussion then turned to the materials defendant wished to receive. The judge assured defendant that he would order the lawyers to furnish defendant with everything he required, and then said: "Let's try it for a few days and see how things go. I don't want you to represent yourself. I just don't—I think that would be unfair." Defendant did not appear reassured. When asked what was on his mind, defendant responded, "I was thinking of I want to get the right representation from my lawyers concerning this matter." The judge then indicated that he would require defendant's lawyers to stay on the case, and denied defendant's motion "to represent himself in the trial of this case," citing the following factors: 1) that defendant was charged with serious crimes' for which he could receive the death penalty or life imprisonment, 2) that defendant was twenty-eight years old and had completed only ten years of education, 3) that defendant had an IQ of 78, "borderline range of intellectual functioning," 4) that Messrs. Braswell and Jordan were competent, experienced attorneys, and 5) that defendant had no access to "law books" in prison and was incapable of retaining a private attorney. The judge concluded "as a matter

of law" that defendant was "incapable of adequately representing himself in the trial of his case."

At the outset, we note that the trial court based its ruling on erroneous grounds. A defendant's right to represent himself, guaranteed in state criminal proceedings by the Sixth and Fourteenth Amendments of the United States Constitution,[1] does not depend on his ability to present an effective defense. *Faretta v. California*, 422 U.S. 806, 834, 45 L. Ed. 2d 562, 581 (1975). The right protects individual free choice and therefore must be honored even though its exercise may undermine the objective fairness of a proceeding. As stated in *Faretta*, "although [the defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored out of 'that respect for the individual which is the life-blood of the law.'" *Id.* (quoting *Illinois v. Allen*, 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363 (Brennan, J., concurring) (1970) ). Under *Faretta*, a defendant who clearly elects to represent himself must be permitted to do so upon the sole condition that he make a knowing and voluntary waiver of the right to counsel. *Id.* at 835, 45 L. Ed. 2d at 581-82. Nor does a defendant need the skill of a lawyer to knowingly waive counsel. Such a waiver will be found if the defendant has been made aware of the benefits of counsel and understands the consequences of foregoing those benefits. *Id.; see also* N.C.G.S. § 15A-1242.

Despite the trial court's erroneous reasoning, we find no error in its ruling since Mr. Williams never clearly asserted his right to proceed *pro se*. Unlike the right to counsel, the *Faretta* right does not arise until asserted. *Brown v. Wainwright*, 665 F.2d 607, 610 (5th Cir. 1982). To properly assert the right, the defendant must "clearly and unequivocally" request to represent himself. *Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 582; *see also State v. Thomas*, 331 N.C. 671, 673, 417 S.E.2d 473, 475 (1992). As explained by the court in *Meeks v. Craven*, 482 F.2d 465 (9th Cir. 1973), this rule is required to prevent defendants from manipulating trial courts by recording an equivocal request at trial and then arguing on appeal, as appropriate, either that they have been denied the right to represent themselves or that they did not make a knowing waiver and have therefore been denied the right to counsel. 482

1. In North Carolina, the right of self-representation is also guaranteed by Article I, Section 23 of the North Carolina Constitution, *State v. Mems*, 281 N.C. 658, 670-72, 190 S.E.2d 164, 172-73 (1972), and by statute, N.C.G.S. § 15A-1242.

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

F.2d at 467-68. To prevent such gamesmanship, we refuse to find an assertion of the *Faretta* right if the defendant's statements or actions create any ambiguity as to his desire to represent himself.

In *Meeks*, the seminal case on this issue, the defendant requested to proceed *pro se* in order to present a motion his counsel had advised against. The defendant was permitted to present his motion, after which the court asked him whether he wanted to continue representing himself. The defendant replied, " 'Yes, Your Honor, I think I will.' " The Ninth Circuit held that Meeks had never asserted his right to represent himself because his conduct, viewed as a whole, indicated a desire only to present a single motion. The court reasoned further that the statement, " 'I think I will,' " was a "prototype of equivocation." *Id.* at 467.

North Carolina courts have been equally strict in scrutinizing alleged requests to proceed *pro se*. This Court has held on many occasions that a mere request to substitute counsel is insufficient to assert the *Faretta* right. *See, inter alia, State v. Branch*, 288 N.C. 514, 220 S.E.2d 495 (1975), *cert. denied*, 433 U.S. 907, 53 L. Ed. 2d 1091 (1977), *overruled on other grounds by State v. Adcock*, 310 N.C. 1, 310 S.E.2d 587 (1984); *State v. Cole*, 293 N.C. 328, 237 S.E.2d 814 (1977); *and State v. Hutchins*, 303 N.C. 321, 279 S.E.2d 788 (1981). Similarly, this Court has held that a request to participate with court-appointed counsel in conducting the trial does not constitute a clear and unequivocal request to proceed *pro se*. *State v. Thomas*, 331 N.C. 671, 417 S.E.2d 473 (1992). And, like the Ninth Circuit, we have refused to find an assertion of the *Faretta* right, despite a defendant's request to proceed without counsel, where the defendant's contemporaneous statements made that request ambiguous. *State v. McGuire*, 297 N.C. 69, 254 S.E.2d 165, *cert. denied*, 444 U.S. 943, 62 L. Ed. 2d 310 (1979); *see also State v. Gerald*, 304 N.C. 511, 284 S.E.2d 312 (1981).

In *McGuire*, defendant indicated at his arraignment hearing that he wanted the trial court to appoint him a new lawyer because he could not agree with his present one. Defendant added, " 'I am asking the court to let me defend myself in these cases.' " When the trial court refused to appoint new counsel, defendant repeated, " 'I am asking for another attorney.' " Thereafter, defendant reconciled with his attorney and specifically consented to his representation. On appeal, this Court held that, despite defendant's one request to represent himself, his statements and conduct viewed

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

as a whole evinced only a desire for new counsel. Thus, defendant had "never 'clearly and unequivocally' asserted his desire to conduct a *pro se* defense." 297 N.C. at 82-83, 254 S.E.2d at 173-74.

We believe the case at bar is properly analogized to *McGuire*. As in *McGuire*, defendant at one point requested to proceed *pro se*. But when this request is viewed in the context of his other statements, it is apparent that defendant's primary desire was to ensure adequate representation by counsel, and that he never took a firm position on whether to proceed *pro se*.

When first addressing the trial judge, defendant expressed concern that his attorneys were not communicating with him adequately, and requested substitute counsel. When informed that he would not be permitted new counsel, and that his only options were to continue with present counsel or proceed *pro se*, defendant initially declined to represent himself. Soon thereafter, he changed his mind. Thus, defendant vacillated from the beginning.

That defendant still wished to be represented by counsel, despite his request to proceed *pro se*, is apparent from his statement the next day:

> I understand the situation that I have chosen to represent myself. It is not that I would like to represent myself but if I could get a full new complete set of lawyers representing me and I would feel fair with that representation. I would like to continue on with my trial if I was able to receive things that I am entitled to have concerning my trial or evidence that is brought up against me and so on, state witnesses and so on.

Thereafter, defendant specifically agreed to continue with present counsel on the trial judge's assurance that he would be provided with all the information he required. Tellingly, defendant never again requested to proceed *pro se*. Though he did reiterate his concern that he receive "the right representation from my lawyers," this statement merely confirms the fact that he wished to be represented by counsel.

We therefore hold that defendant was not denied his right to represent himself at trial because he never asserted that right "clearly and unequivocally." We are reassured in so holding by the knowledge that, had defendant been permitted to represent himself based on his equivocal requests, he would now be arguing

with some justification that he was denied the right to counsel. We refuse to place trial courts "in a position to be whipsawed by defendants clever enough to record an equivocal request to proceed without counsel in the expectation of a guaranteed error no matter which way the trial court rules." *Meeks*, 482 F.2d at 468.

This assignment of error is overruled.

## D

[5] Defendant assigns error to certain of the trial court's evidentiary rulings. Specifically, he argues that the trial court erred in admitting a tape recording allegedly containing admissions by defendant, in admitting gory pictures of the victim and in admitting evidence seized at defendant's residence.

The prosecution introduced over defendant's objection a tape recording allegedly containing an admission by defendant that he killed Theron Price. Defendant argues that the recording should not have been admitted because it was largely inaudible. He says he was prejudiced by this error in that the prosecutor and Angelo Farmer, the government witness who made the recording, were permitted to interpret the tape for the jury, putting words in defendant's mouth that the jurors could not have heard themselves. We believe the tape was properly admitted.

At the *voir dire* hearing held to determine admissibility, Angelo Farmer testified to having engaged defendant in conversation about the killing while wearing a concealed tape recording device. The trial court listened to the tape recording twice, once with a transcript prepared by a police officer, and once without the transcript, and found the recording admissible. In its findings of fact and conclusions of law, the court noted that "the tape recording is inaudible and unintelligible in many respects but there are sporadic portions that are audible and intelligible and could be enlightening to the jury."

North Carolina courts have long recognized that a tape recording may be excluded if inaudible. The rule was first articulated in *State v. Lynch*, 279 N.C. 1, 181 S.E.2d 561 (1971), where we held that a trial court may not admit a tape recording without first conducting a *voir dire*, out of the presence of the jury, to determine whether the recording is " 'sufficiently audible, intelligible, not obviously fragmented . . . .' " 279 N.C. at 17, 181 S.E.2d at 571 (quoting *State v. Driver*, 38 N.J. 255, 288, 183 A. 2d 655,

672 (1962) ). Numerous subsequent cases have cited with approval the language in *Lynch* requiring that a tape recording be sufficiently audible. *See, e.g., State v. Gibson,* 333 N.C. 29, 41, 424 S.E.2d 95, 102 (1992), *overruled on other grounds by State v. Lynch,* 334 N.C. 402, 432 S.E.2d 349 (1993); *State v. Shook,* 55 N.C. App. 364, 366-67, 285 S.E.2d 328, 329 (1982); *and State v. Jeeter,* 32 N.C. App. 131, 133, 230 S.E.2d 783, 785, *disc. review denied,* 292 N.C. 268, 233 S.E.2d 394 (1977); *cf. State v. Hammette,* 58 N.C. App. 587, 590, 293 S.E.2d 824, 826 (1982) (inaudible tape recording not inadmissible "unless defects are so substantial as to leave the recording without probative value or to render the recording as a whole untrustworthy"); *and Searcy v. Justice,* 20 N.C. App. 559, 565, 202 S.E.2d 314, 317-18, *cert. denied,* 285 N.C. 235, 204 S.E.2d 25 (1974) ("a tape recording should not be excluded merely because parts of it are inaudible if there are other parts that can be heard").

Forsaking this line of authority, defendant relies instead on a related, but obsolete, holding of *Lynch. Lynch* not only created the *voir dire* rule discussed above, but also established detailed standards for authenticating tape recordings. *State v. Stager,* 329 N.C. 278, 316-17, 406 S.E.2d 876, 898 (1991). Defendant relies on the latter aspect of *Lynch,* and thus presents his inaudibility claim in improper authentication clothing. Under *Lynch,* the proponent of a tape recording was required to show:

1) that the recorded testimony was legally obtained and otherwise competent;

2) that the mechanical device was capable of recording testimony and that it was operating properly at the time the statement was recorded;

3) that the operator was competent and operated the machine properly;

4) the identity of the recorded voices;

5) the accuracy and authenticity of the recording;

6) that defendant's entire statement was recorded and no changes, additions, or deletions have since been made; and

7) the custody and manner in which the recording has been preserved since it was made.

279 N.C. at 17, 181 S.E.2d at 571. Defendant asserts that this test, which he considers binding despite the 1984 adoption of the North Carolina Rules of Evidence, was not met in the case at bar. Specifically, he argues that the trial court failed to make findings of fact as to items 1) through 3). He contends further that the State could not have proven items 2) and 3) because the tape was inaudible.

As the State correctly points out, the seven-prong *Lynch* test has been superseded by the authentication requirements of Rule 901. *Stager*, 329 N.C. at 317, 406 S.E.2d at 898. Under Rule 901, authentication is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901 (1992). The State provided such evidence in the form of testimony by Angelo Farmer that the tape was a true recording of his conversation with defendant. Thus, the tape recording was properly authenticated, and the trial court did not err in failing to make findings of fact in accordance with the *Lynch* test.

[6] Holding that the tape recording was properly authenticated does not, however, answer defendant's contention that the tape was too inaudible to be admissible. Under *Stager*, authentication is not the only prerequisite to the admissibility of a tape recording. A tape must also be shown to have been legally obtained and to contain "otherwise competent evidence." *Stager*, 329 N.C. at 317, 406 S.E.2d at 898. Under the first holding of *Lynch*, and the cases citing it, a tape recording which is not "sufficiently audible" cannot be considered competent evidence.

Whether a tape recording is sufficiently audible to be admitted is to be first determined by the trial court. The trial court in the case at bar found the tape audible enough to be "enlightening to the jury." Having listened to the tape ourselves, we agree. Though defendant's voice is often inaudible, he can clearly be heard describing the incident at Dewey Brothers and, at one point, saying, "I done killed the m----- f-----." As noted in *Searcy*, "a tape recording should not be excluded merely because parts of it are inaudible if there are other parts that can be heard." 20 N.C. App. at 565, 202 S.E.2d at 317-18. We hold that the trial court did not err in admitting the tape recording.

[7] Nor is there merit to defendant's argument that he was unfairly prejudiced when Angelo Farmer and the prosecutor were permit-

ted to "interpret" the tape recording for the jury. Farmer testified to defendant's statements from his own knowledge of the conversation, not from listening to the tape recording. The prosecutor, in his closing statement, *argued* that the tape contained various incriminating statements by defendant. It was up to the jury, however, to decide what defendant said. The jury was free to discredit Farmer's testimony, and the prosecutor's arguments, if it saw fit to do so.

This assignment of error is overruled.

### E

[8] Defendant next assigns error to the State's use of two photographs showing the victim as found at the crime scene, lying faceup with blood streaked across his face and head. The State first introduced these photographs to illustrate the testimony of Dewey Brothers, Inc., president Richard Helms, who found the victim's body. A few days later, the State published these photographs to the jury a second time to illustrate the testimony of Officer Honeycutt, the SBI agent who analyzed the crime scene. Defendant takes issue not with the initial publication of the photographs, but rather with their republication. Characterizing the photographs as "excessively grim," he argues that the second showing had no value other than to inflame the passions of the jury. We believe the trial court acted correctly in permitting the photographs to be twice published.

Whether to admit gory photographs, how many to admit and how the photographs should be used are questions left to the sound discretion of the trial court, guided by the precept of Rule 403 of the North Carolina Rules of Evidence, N.C.G.S. § 8C-1, that evidence may be excluded if its probative value is "substantially outweighed" by the danger of unfair prejudice. *State v. Hennis*, 323 N.C. 279, 283, 372 S.E.2d 523, 526 (1988). The trial court's ruling will not be overturned absent an abuse of discretion. *Id.* at 285, 372 S.E.2d at 527. As a general rule, gory photographs have been held admissible, if properly authenticated and otherwise competent, as long as they are not aimed solely at arousing the passions of the jury, i.e., if they have some probative value. *See, e.g., State v. Murphy*, 321 N.C. 738, 365 S.E.2d 615 (1988); *State v. Holden*, 321 N.C. 125, 362 S.E.2d 513 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988); *see also* 40 Am. Jur. 2d *Homicide* § 419 (1968). By the same token, gory photographs have been held

**STATE v. WILLIAMS**

[334 N.C. 440 (1993)]

excludable if they merely reiterate photographic evidence already presented, since the additional photographs may lack probative value, tending only to inflame the jury. *Hennis*, 323 N.C. at 286, 372 S.E.2d at 526-27; *State v. Mercer*, 275 N.C. 108, 120, 165 S.E.2d 328, 337 (1969). The same logic, of course, has been applied to the repeated publication of the same photograph or set of photographs. *Hennis*, 323 N.C. at 286-87, 372 S.E.2d at 528.

In *Hennis*, a triple murder case, the trial court admitted thirty-five color photographs of the murder victims, taken at the crime scene and at the autopsy. The photographs depicted in graphic detail numerous stab wounds on each of the bodies, and were particularly gruesome since the bodies had begun decomposing by the time the pictures were taken. The trial court permitted the photographs to be shown to the jury twice. The photographs were first shown as slides, projected on a large screen directly above defendant's head, and accompanying testimony by those who found the bodies and by the forensic pathologists. At the close of the State's evidence, the photographs were distributed to the jury one at a time, unaccompanied by further testimony. 323 N.C. at 282-83, 372 S.E.2d at 525-26.

On these facts, this Court ordered a new trial, reasoning that many of the slides were repetitive, showing substantially the same images, and thus added nothing of probative value to the State's case; that the manner in which the repetitive slides were displayed served to compound their prejudicial effect; and that the republication of the photographs was redundant and performed in a prejudicial manner. *Id.* at 286, 372 S.E.2d at 527-28. The Court said, "permitting the photographs with redundant content to be admitted into evidence and to be twice published to the jury was error." *Id.* at 286-87, 372 S.E.2d at 528.

Defendant analogizes the case at bar to *Hennis*, arguing that the republication of the photographs was "unnecessarily repetitive" and that it was performed "for no other reason than to inflame the jurors' anger towards defendant." Defendant's analogy is inapposite. First, unlike the situation in *Hennis*, here the republication of the photographs had probative value. Whereas the photographs were first published to illustrate Helms' testimony describing in broad terms the crime scene as found, they were republished in aid of Officer Honeycutt's detailed testimony reconstructing the manner in which the crime had occurred. Indeed, Helms testified

merely that he had found the body in the steel shed, lying faceup with arms and legs straight out and blood on the face and head. Honeycutt testified to the precise location of the body, measured to the inch from the walls of the shed, and to having discovered no blood on the ground around the body despite a painstaking search. He testified that the blood from the victim's wounds had run across his head horizontally and diagonally and was spattered on the victim's arms, on the front of his jacket and on one of his hands. Clearly, the republication of the photographs would have been quite useful in illustrating Honeycutt's more detailed testimony. By contrast, the photographs in *Hennis* were republished without any further testimony.

Second, the republication of the photographs in the case at bar created very little danger of unfair prejudice. Even though they show the victim's multiple head wounds, and blood covering his face and head, the photographs are not nearly as gory as those in *Hennis*. Nor were the photographs presented in a fashion likely to heighten the jury's emotional reaction. Recall that in *Hennis*, the prosecution concluded its case in chief by passing the thirty-five photographs to the jury one by one and in total silence. By that time, the jury had been exposed to *seventy* gory, disturbing images. 323 N.C. at 286, 372 S.E.2d at 528. Here the prosecution republished the photographs to the jury along with roughly sixty other exhibits germane to Officer Honeycutt's testimony. With the republication, the jury had been exposed to four gory images.

Thus, the republication was probative and created little danger of unfair prejudice. We hold the trial court did not abuse its discretion in allowing it.

This assignment of error is overruled.

F

[9] Defendant contends, finally, that the trial court erred in denying his motion to suppress statements he made at his arrest and physical evidence seized during a search incident to that arrest. According to defendant, the statements should have been suppressed because obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694 (1966); the physical evidence should have been excluded because a fruit of the illegally obtained statements. *See*

## STATE v. WILLIAMS

[334 N.C. 440 (1993)]

*Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441 (1963).[2]
We believe the trial court properly denied defendant's motion.

At the suppression hearing, Officer Sullivan testified as follows: Pursuant to warrants for murder and attempted safe-cracking, he arrested defendant at a boarding house called the Salem Lodge, in the room of one Mr. Artis. Upon placing defendant in custody, he informed him of his *Miranda* rights and asked whether he understood those rights. Defendant responded, "yes." He then asked defendant, first, whether he wished to waive his right to remain silent, and then, whether he wished to waive his right to have counsel present during questioning. Defendant stood mute at each of these questions, making no response whatsoever. Soon thereafter, someone behind Sullivan asked defendant whether anything in the room belonged to him. Defendant responded that he owned the boxes (located on the floor). Sullivan then asked defendant whether he would consent to a search of the boxes, to which defendant responded, "yes." The boxes, containing clothing and other personal effects, were searched for weapons and then removed to the police station.

Sullivan testified further that there were four officers at the scene of the arrest, two in the room and two at the door; that neither promises, nor threats, nor trickery were used to elicit defendant's statements; that defendant appeared to be coherent; and that defendant did not appear to be under the influence of drugs or alcohol.

Crediting this testimony, and discounting defendant's testimony to the contrary, the trial court found as fact that defendant had been read his rights, that he did not respond to Sullivan's questions regarding waiver but thereafter indicated he owned the boxes and consented to having them searched, that he made these statements free from coercion or inducement and while coherent, and that he understood his rights. Based on these findings, the trial court held defendant's statements admissible, concluding that he had "freely, knowingly, intelligently, and voluntarily" waived his rights to remain silent and to counsel. The trial court also held the boxes

---

2. In the caption for this assignment of error, defendant also asserts that the evidence was introduced in violation of the Fourth and Sixth Amendments and of Article 19 of the North Carolina Constitution. He has failed to brief these contentions, however, and we deem them abandoned under the authority of N.C. R. App. P. 28(a).

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

admissible because seized incident to a lawful arrest; it thereupon denied defendant's motion to suppress.

Defendant does not take issue with the trial court's findings of fact. He challenges instead the court's conclusion of law that he knowingly and voluntarily waived his *Miranda* rights. According to defendant, waiver cannot be inferred from his conduct at the arrest since he "never said or did anything . . . to indicate he had waived his rights." To the contrary, however, defendant answered the officers' questions free from coercion and after indicating that he understood his rights. These facts are sufficient to justify the trial court's ruling that he impliedly waived his rights.

*North Carolina v. Butler*, 441 U.S. 369, 60 L. Ed. 2d 286 (1979), established that waiver of *Miranda* rights may be either express or implied. In that case, the defendant was advised of his *Miranda* rights and indicated that he understood those rights. He refused, however, to sign a written waiver, stating: " 'I will talk to you but I am not signing any form.' " He then made incriminating statements. *Id.* at 371, 60 L. Ed. 2d at 291. Overruling the North Carolina Supreme Court's holding that the defendant's waiver was invalid because not "specifically made," the Court held that an express written or oral statement of waiver was "not inevitably either necessary or sufficient to establish waiver." 441 U.S. at 373, 60 L. Ed. 2d at 292. As the Court explained:

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda*, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

*Id.*

Following the lead of *Butler*, this Court has consistently held that a defendant may validly waive his *Miranda* rights by answering questions from the police, even though he has initially refused to expressly waive his rights. In *State v. Connley*, 297 N.C. 584, 256 S.E.2d 234, *cert. denied*, 444 U.S. 954, 62 L. Ed. 2d 327 (1979), the defendant stated after reading an Advice of Rights form, " 'I

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

know what it says and I understand, but I'm not going to sign it.' " He then answered questions for a short time, ignoring some questions and terminating the interview by asking for a lawyer. *Id.* at 586-88, 256 S.E.2d at 236. On these facts, we held that the defendant had impliedly waived his *Miranda* rights. *Id.* at 588-89, 256 S.E.2d at 237. Similarly, in *State v. Vickers*, 306 N.C. 90, 291 S.E.2d 599 (1982), we found a valid waiver where the defendant did not expressly waive his rights but rather indicated that he understood them and then answered questions "during a general conversation that occurred on the way to the jail." *Id.* at 92, 96, 291 S.E.2d at 602, 604.

In both of these cases, the critical facts supporting waiver were: 1) that the defendant demonstrated an understanding of his rights, and 2) that the questioner exerted no pressure on the defendant to answer questions, whether by way of coercion, intimidation or trickery. *Connley*, 297 N.C. at 588-89, 256 S.E.2d at 237; *Vickers*, 306 N.C. at 96, 291 S.E.2d at 604. These facts obtain equally in the case at bar. First, though defendant remained silent when asked if he would waive his rights, he did affirmatively state that he understood his rights. He appeared coherent at the time and was, as the trial court also found, "capable of understanding his rights." Second, the police did not pressure him in any way to answer their questions. Thus, we can infer that in answering the officers' questions after expressly acknowledging that he understood his right not to do so in the absence of counsel, defendant impliedly waived his rights to remain silent and to counsel.

Since defendant's statements were legally obtained, the seizure of the boxes he identified as belonging to him, otherwise legal, was not tainted. We conclude that the trial court properly admitted defendant's statements and his boxes.

This assignment of error is overruled.

IV

Having found that the trial court gave an unconstitutional instruction on the meaning of "reasonable doubt," we order a new trial. Those additional assignments of error discussed above are overruled.

NEW TRIAL.

STATE v. WILLIAMS

[334 N.C. 440 (1993)]

Justice Parker did not participate in the consideration or decision of this case.

Justice MEYER dissenting.

I dissent from the majority's decision to grant a new trial for *Cage* error essentially for the same reasons I expressed concerning that issue in my dissent in *State v. Montgomery*, 331 N.C. 559, 577, 417 S.E.2d 742, 752 (1992), and *State v. Bryant*, 334 N.C. 333, 343, 432 S.E.2d 291, 297 (1993). As in *Bryant*, defendant here did not object to the reasonable doubt instruction given by the trial judge.

*Cage* does not dictate that we find reversible error in the instant case. In *Cage*, the Supreme Court found error in the Louisiana trial court's reasonable doubt instruction, stating:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable doubt standard. *When those statements are then considered with the reference to "moral certainty,"* rather than evidentiary certainty, it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage v. Louisiana*, 498 U.S. 39, 41, 112 L. Ed. 2d 339, 342 (1990) (emphasis added).

In reading *Cage* broadly, the majority opinion deviates from virtually every other appellate court in the land that has considered the matter. *See Gaskins v. McKellar*, --- U.S. ---, 114 L. Ed. 2d 728 (Stevens, J., concurring in denial of writ of certiorari and acknowledging that *Cage* is to be read narrowly and emphasizing the critical import of the "grave uncertainty" language), *reh'g denied,* --- U.S. ---, 115 L. Ed. 2d 1098 (1991); *Smith v. State*, 588 So. 2d 561 (Ala. Crim. App. 1991) (finding no error in use of terms "actual and substantial doubt" and "moral certainty"); *Adams v. State*, 587 So. 2d 1265 (Ala. Crim. App. 1991) (finding permissible

use of terms "actual and substantial doubt" and "moral certainty"); *Fells v. State*, 587 So. 2d 1061 (Ala. Crim. App. 1991) (finding use of term "moral certainty" to be proper); *People v. Jennings*, 53 Cal. 3d 334, 807 P.2d 1009, 279 Cal. Rptr. 780 (same), *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 462 (1991); *Commonwealth v. Beldotti*, 409 Mass. 553, 567 N.E.2d 1219 (1991) (instruction permissible with "moral certainty" language); *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991) (instruction permissible when "moral certainty" and "actual and substantial doubt" used).

The majority's extremely broad interpretation of *Cage* in *Bryant*, which it says dictates the result here, seems more an excuse than a reason for granting a new trial. The reasonable doubt instruction that the majority finds to be reversible error is one that has been employed by our trial judges for many years and in many cases. I anticipate that this Court will be called upon to review many cases in which the same or a similar jury charge was employed. Unlike *McKoy* error, which affects only the sentencing proceeding of a capital trial, the error here affects both capital and noncapital trials and requires a totally new trial. The impact of *McKoy* on our criminal justice system may dim in comparison to the impact of this Court's interpretation of *Cage*. For this and other reasons, I would allow a federal appellate court to speak to this issue before granting new trials that may prove to be unnecessary.

I believe that the majority errs in its conclusion that the reasonable doubt instruction tendered by the trial court was error requiring a new trial.