STATE OF NORTH CAROLINA v. WILLIAM ALLEN VICKERS

No. 106A81

(Filed 2 June 1982)

1. **Constitutional Law § 48— failure to raise insanity defense—no denial of effective assistance of counsel**

   A defendant charged with arson and the burning of two tobacco barns and one tobacco storage building was not denied the effective assistance of counsel by the failure of his appointed attorney to investigate and raise an insanity defense where a report from a local mental health center finding defendant competent to stand trial noted that defendant did have a history of psychiatric treatment and that defendant's responsibility at the time of the alleged crimes could not be determined because defendant claimed amnesia, but the record in the case did not present such evidence of insanity that it could be concluded that defense counsel's failure to present an insanity defense resulted from neglect or ignorance rather than from informed professional deliberation.

2. **Criminal Law § 75.11— in-custody statement—implied waiver of right to counsel**

   Where defendant was advised of his constitutional rights when he was taken into custody and he acknowledged that he heard and understood his rights, and during a general conversation on the way to jail, a deputy sheriff commented that he could not understand why defendant did it, defendant in effect waived his right to counsel when he stated that "these people down here in this community have been wanting to get rid of me for a long time, so I thought I'd give them a reason," and the statement was admissible in evidence at defendant's trial.

3. **Criminal Law § 75.14— mental capacity to confess**

   The evidence was sufficient to support the trial court's determination that defendant had the mental capacity to waive his constitutional rights and to make incriminating statements, although the evidence did indicate that defendant had a history of psychiatric treatment, where the evidence showed that he had been living independent of medical supervision for several months prior to the time of his arrest and that he was coherent and able to move about under his own power when the statements were made.

4. **Arson and Other Burnings § 2— burning of tobacco barn and storage building—indictment under proper statute**

    Defendant could properly be indicted under G.S. 14-62 for the burning of a tobacco *barn* and the burning of a tobacco *storage building* rather than under the provisions of G.S. 14-64 relating to the burning of a tobacco *house* since a tobacco *house* as used in G.S. 14-64 does not have a generally accepted connotation or definition.

5. **Arson and Other Burnings § 4.2— common law arson—temporary absence of occupants of dwelling**

    Common law arson results from the burning of a dwelling even though its occupants are temporarily absent at the time of the burning.

APPEAL by defendant from *Strickland, J.,* 1 June 1981 Session STOKES County Superior Court.

Upon pleas of not guilty, defendant was tried on bills of indictment charging him with (1) arson of a dwelling house owned and occupied by Ralph Bullins; (2) burning a tobacco barn belonging to Guy Barker; (3) burning a tobacco barn belonging to John Sheppard; and (4) burning a tobacco storage building belonging to Carol Wester. On the arson indictment, following the name of the district attorney, appears the citation G.S. 14-58. On the other indictments appear the citation G.S. 14-62. All offenses allegedly took place on 22 November 1980.[1]

The state offered evidence at trial tending to show that:

On the evening of 22 November 1980 several fires were set in the Brim Road area of Stokes County. At that time defendant resided with his parents at their home on Route 1, Madison, North Carolina. Ralph Bullins, a neighbor of the Vickers, lived approximately one-tenth of a mile down the road from their house. Early on the night of the fires Bullins saw defendant, loaned him three dollars and drove him to the store and back. Bullins left his house again around 8:30 p.m. after defendant left on foot. When Bullins returned home about 11:45 p.m., portions of his house, including the bathroom and back porch, had been burned out.

John Sheppard's farm adjoined defendant's parents' property. At 11:00 p.m. on 22 November he learned that his tobacco

---

1. Defendant was also tried on indictments charging him with three counts of attempted arson. At the close of the state's evidence, the court allowed defendant's motion to dismiss these three charges.

barn was burning. The fire had been set from outside the structure and the barn burned to the ground. Fred Smith discovered that his three story packhouse was burning around 11:00 p.m. that evening. The fire rendered the storage building useless and it had no salvage value. The loss was estimated by Smith to be $15,000.00. At approximately 10:30 p.m. Guy Barker learned that his barn was burning. All that was left after the fire was the hole under the barn into which the metal roof had collapsed.

On that same evening defendant visited L. B. Bullins at his home. L. B. Bullins testified that defendant stayed for about 10 minutes then left on foot at approximately 9:30 p.m. While there defendant asked Bullins which barn was his and told him that: "He was going to have some fun; he was going to set some fires." Bullins also observed that defendant was carrying someone else's mail. One of the envelopes was open and contained two packages of matches. Approximately 15 minutes after defendant left the house, Bullins observed a fire about a half mile down the road. He also saw several other structures burning during the night.

Later that evening defendant returned to his parents' home. He told his parents that they should look out the window if they wanted to see something pretty. Defendant's father, Norman Vickers, testified that they could see a large blaze in the vicinity of either the Martin or Barker farm. Vickers also stated that when he asked defendant if he set fire to the barn, defendant answered "I'm not saying that I did and I'm not saying that I didn't."

Defendant was arrested between 3:00 and 4:00 a.m. on the morning of 23 November 1981 after being tracked through the woods by bloodhounds. After he was taken into custody he was transported to the Stokes County Jail by Deputy Sheriff Reeves. Officer Reeves testified that he advised defendant of his constitutional rights when he placed him in the patrol car and that defendant acknowledged that he heard and understood his rights. While driving to the jail, Deputy Reeves remarked that he could not understand why defendant did it, to which defendant replied that "these people down here in this community have been wanting to get rid of me for a long time, so I thought I'd give them a reason."

On arrival at the jail defendant was taken to the office of Detective Collins, an investigator with the Stokes County Sheriff's Department. He was informed of the charges against him and advised of his constitutional rights. Detective Collins testified that he asked defendant if he wanted a lawyer and defendant said no. In acknowledgment that he had been read and understood his constitutional rights, defendant signed the bottom of the form Detective Collins used to inform him of those rights. Detective Collins then proceeded to ask defendant about the various fires. Defendant admitted setting each of them but gave no explanation for his actions.

Defendant offered no evidence at trial. The jury found defendant guilty of the four charges submitted. Judgment was entered by the court sentencing defendant to life imprisonment on the arson conviction. The court consolidated the three convictions under G.S. 14-62 for judgment and imposed a sentence of 15 years to commence at the termination of the life sentence.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Sarah C. Young, for the state.*

*Adam Stein and James H. Gold, Appellate Defenders, for defendant-appellant.*

BRITT, Justice

[1] By his first assignment of error, defendant contends that he was denied effective assistance of counsel by the failure of his appointed attorney to investigate and raise an insanity defense. We find no merit in this assignment.

The right to counsel is guaranteed by the sixth amendment to the United States Constitution and made applicable to the states by the fourteenth amendment, and by Article I, Sections 19 and 23 of the North Carolina Constitution. This constitutional right to counsel has long been recognized as an entitlement to the effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759 (1970); *Powell v. Alabama,* 287 U.S. 45 (1932); *State v. Speller,* 230 N.C. 345, 53 S.E. 2d 294 (1949); and *State v. Sneed,* 284 N.C. 606, 201 S.E. 2d 867 (1974).

The test of effective assistance of counsel recently adopted by this court is that used by the U.S. Supreme Court to evaluate

advice given a criminal defendant in *McMann v. Richardson,
supra; State v. Misenheimer,* 304 N.C. 108, 282 S.E. 2d 791 (1981);
*State v. Milano,* 297 N.C. 485, 256 S.E. 2d 154 (1979). Under the
*McMann* test the determination to be made is whether the
assistance given was "within the range of competence demanded
of attorneys in criminal cases." 397 U.S. at 771.

The record in the case *sub judice* shows that defendant's ap-
pointed counsel successfully sought to have his client screened by
the Forsyth-Stokes Mental Health Center in order to determine
whether further psychiatric evaluation at Dorothea Dix Hospital
in Raleigh would be necessary. A lengthy report from the
Forsyth-Stokes facility noted that defendant did have a history of
psychiatric treatment but found that he was competent to stand
trial. No determination of defendant's responsibility at the time of
the alleged crimes was possible because defendant claimed
amnesia.

Defendant asserts that on the basis of this evaluation,
defense counsel should have further investigated the possibility of
an insanity defense and sought the assistance of psychiatric ex-
perts. We disagree.

Relief is rarely granted by the courts on the ground asserted
by defendant and a stringent standard of proof that effective
assistance of counsel was denied has been consistently required.
*State v. Sneed, supra.*

We cannot conclude that defendant was denied effective
assistance of counsel absent some evidence of defendant's insanity
or a showing that with the exercise of due diligence an insanity
defense could have been developed. *State v. Misenheimer, supra.*
The test of insanity as a defense to a criminal prosecution in this
jurisdiction is whether defendant, at the time of the alleged act,
was laboring under such a defect of reason, from disease or defi-
ciency of mind, as to be incapable of knowing the nature and
quality of his act, or if he does know this, was by reason of such a
defect of reason incapable of distinguishing between right and
wrong in relation to such act. *State v. Jones,* 293 N.C. 413, 425,
238 S.E. 2d 482 (1977).

The record in the case at bar does not present such evidence
of insanity that we can conclude that defense counsel's failure to

present an insanity defense resulted from neglect or ignorance rather than from informed professional deliberation. *Marzullo v. Maryland*, 561 F. 2d 540 (4th Cir. 1977), *cert. denied*, 435 U.S. 1011 (1978).

The report from the Forsyth-Stokes Mental Health Center stated that there was no evidence of a thought disorder. The state's evidence showed that defendant was coherent at the time of his arrest in the early morning after the burnings. Defendant, by his own statement, gave a reason for his actions, which while not acceptable to excuse his conduct, clearly shows that he had a motive and that his actions were deliberate.

"Well, these people down here in this community have been wanting to get rid of me for a long time, so I thought I'd give them a reason. (T p 108)

Further, defendant's psychiatric history revealed abuse of alcohol and drugs and numerous criminal acts. It is completely plausible and within the range of competence required that defense counsel chose not to assert an insanity defense as a trial tactic to keep defendant's long and unsavory record from the jury.

As was noted in *State v. Milano, supra,* and *State v. Sneed, supra,* an ineffective assistance of counsel claim more appropriately should be raised in a post-conviction hearing where evidence can be presented to determine why counsel chose to proceed as he did. We will not try to second guess counsel on this issue. Suffice to say, the record before us does not establish that counsel's assistance was anything less than the standard required. This assignment of error is overruled.

[2] Defendant contends by his next assignment of error that the trial court erred in admitting into evidence defendant's incriminating statement to Deputy Reeves in that the state failed to prove that he knowingly and intelligently waived his right to counsel. Further, defendant asserts that his subsequent incriminating statement made to Detective Collins at the sheriff's department should also have been suppressed as it is presumed to be the product of the first illegally obtained confession.

The U.S. Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966), that a criminal suspect upon arrest or being taken into custody, must be adequately and effectively informed of his con-

stitutional rights, including the right to retained or appointed counsel. The Court also went on to state that these rights could be waived by a defendant if done voluntarily, knowingly and intelligently.

The reasons for the prophylactic rules created in *Miranda* are to provide safeguards to combat the inherently compelling pressures of in-custody interrogation and to permit a defendant full opportunity to exercise his privilege against self-incrimination. 384 U.S. at 467.

A recent interpretation of *Miranda*, however, rejected the need for an express waiver of constitutional rights, either oral or written.

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver but is not inevitably either necessary or sufficient to establish waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The facts and circumstances surrounding defendant's statements to law enforcement officers clearly show that defendant was adequately and effectively apprised of his constitutional rights. Findings of fact by the trial court on voir dire indicate that defendant was advised of his rights when he was taken into custody and that he acknowledged that he understood those rights. Further, the court found, and the evidence supports the finding, that defendant was coherent at the time and was neither coerced nor promised any reward for making the statement. According to the testimony of Deputy Reeves the incriminating statement was made during a general conversation that occurred on the way to the jail. Reeves commented that he could not understand the reason for the crimes. Defendant responded that the community wanted to get rid of him so he gave them a reason. It is clear under these circumstances that sufficient evidence was presented to support the trial court's conclusion that defendant knowingly and intelligently waived his rights. This assignment of error is overruled.

Likewise, defendant's contention that his subsequent incriminating statement was tainted by the first and should have been suppressed is also without merit. Defendant's subsequent

confession to law enforcement officials was made at the jail after he had again been apprised of his constitutional rights. On this occasion defendant expressly waived his right to counsel and signed the form Detective Collins used to inform him of his rights.

[3] Defendant also argues that his statements should have been suppressed because of his mental condition and the failure of the state to meet its heavy burden of proof to show waiver when the suspect is known to be mentally disturbed. We disagree. Past indicia of mental instability are not necessarily dispositive on this issue. *See State v. Misenheimer, supra.* While the evidence does indicate that defendant had a history of psychiatric treatment, at the time of his arrest he had been living independent of medical supervision for several months.

Further, evidence presented on voir dire indicated that defendant was coherent and able to move about under his own power when the statements were made. The evidence thus amply supports the trial court's conclusion that defendant was in full understanding of his constitutional rights and that he freely, knowingly, intelligently, and voluntarily waived those rights.

[4] By his third assignment of error defendant contends that his convictions under G.S. 14-62 must be reversed because the indictments charging him with those offenses were fatally defective in that the structure burned did not come within the class designated by the statute. Further, he argues that the trial court erred in its instructions to the jury when it improperly assumed that the buildings in question were covered by G.S. 14-62 rather than G.S. 14-64. This assignment has no merit.

Defendant was charged in three separate indictments with burning Guy Barker's tobacco *barn*, John Sheppard's tobacco *barn*, and Fred Smith's tobacco *storage building*.

At the time these alleged offenses were committed G.S. 14-62 provided:

> If any person shall wantonly and willfully set fire to or burn or cause to be burned, or aid, counsel or procure the burning of, any uninhabited house, any church, chapel or meetinghouse, or any stable, coach house, outhouse, warehouse, office, shop, mill, barn or granary, or any building, structure or erection used or intended to be used in

carrying on any trade or manufacture, or any branch thereof, whether the same or any of them respectively shall then be in the possession of the offender, or in the possession of any other person, he shall be guilty of a felony, and shall, on conviction, be imprisoned in the State's prison for not less than two nor more than 40 years, and may also be fined in the discretion of the court.

Defendant contends that he should have been charged under G.S. 14-64 which specifically applies to the burning of tobacco *houses*. At that time G.S. 14-64 provided:

If any person shall wantonly and willfully set fire to or burn or cause to be burned, or aid, counsel or procure the burning of, any ginhouse or tobacco house, or any part thereof, he shall, on conviction, be imprisoned in the State's prison for not less than four months nor more than 10 years, and may also be fined in the discretion of the court.

He argues that G.S. 14-64 uses a specific term which encompasses a tobacco barn and a tobacco storage building, while G.S. 14-62 uses general terms; and that the statute using a specific term applies.

It is clear that we have a question of interpretation of statutes and reconciling statutes relating to the same subject matter, feloniously burning buildings. Our task is made difficult by the fact that the term "tobacco house" used in G.S. 14-64 is not defined by the statute. That being true we must apply the general rules employed in construing statutes.

The cardinal principle of statutory construction is that the intent of the legislature is controlling. *State v. Fulcher*, 294 N.C. 503, 243 S.E. 2d 338 (1978); *State v. Hart*, 287 N.C. 76, 213 S.E. 2d 291 (1975). In *In re Hardy*, 294 N.C. 90, 240 S.E. 2d 367 (1978), this court, speaking through Justice Huskins, said:

A construction which will defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language. *Ballard v. Charlotte*, 235 N.C. 484, 70 S.E. 2d 575 (1952). Where possible, statutes should be given a construction which, when practically applied, will tend to suppress the evil which the

Legislature intended to prevent. 73 Am. Jur. 2d, Statutes, § 157 . . . .

294 N.C. at 96.

It is noted that G.S. 14-64 was enacted in substantially its present form in 1863. Chapter 17, 1863 S.L. It is a matter of common knowledge that buildings, particularly farm buildings, are referred to by various names, *i.e.*, tobacco barns, tobacco curing barns, tobacco packhouses, tobacco storage barns, etc.; and that the terms used in referring to buildings change periodically.[2] The term "ginhouse" has a generally accepted connotation — a building which houses a cotton gin, the mechanism invented by Eli Whitley in the early 19th century to separate the seeds, hulls and foreign material from cotton. *See Webster's Third New International Dictionary*. Webster does not attempt to define a tobacco house but defines a tobacco barn as "a building in which tobacco is cured with or without supplemental heat."

G.S. 14-62 was enacted originally in 1874-5 (Chapter 228, 1874-5 S.L.) and has been amended several times since then. It is clear to us that this statute is intended to encompass, *inter alia*, all farm buildings that do not fall within the common law definition of arson. Since a ginhouse has a generally accepted connotation or definition, it would appear that it would come within the ambit of G.S. 14-64 rather than G.S. 14-62. By the same token, since a tobacco *house* does not have a generally accepted connotation or definition, we hold that an indictment under G.S. 14-62 for burning a tobacco barn or a tobacco storage building is proper. It follows that the court did not err in its jury instructions relating to G.S. 14-62.

[5] By his final assignment of error defendant contends that his common law arson conviction must be vacated because the uncontradicted evidence was that no one was in the house at the time of the burning. This assignment has no merit.

In North Carolina, the crime of arson has not been defined by statute, therefore the common law definition of arson remains in force. *State v. Long*, 243 N.C. 393, 90 S.E. 2d 739 (1956). As de-

---

2. Although the writer grew up on a North Carolina tobacco farm, he never heard anyone refer to a building as a tobacco house.

fined at common law, arson is the wilful and malicious burning of the dwelling house of another person. *State v. White*, 291 N.C. 118, 229 S.E. 2d 152 (1976); *State v. Long, supra.* Further, since arson is an offense against the security of the habitation and not the property, an essential element of the crime is that the property be inhabited by some person. *Id.*

This court has held that "dwelling house" as contemplated in the definition of arson means an *inhabited* house. *State v. Clark*, 52 N.C. 167 (1859). We reject defendant's attempt to equate *inhabit* with *occupy.* In *Black's Law Dictionary* 703 (Rev. 5th ed. 1979), we find that inhabit is "synonymous with dwell, live, reside, sojourn, stay, rest"; occupy is not listed as a synonym.

In *State v. Gulley*, 46 N.C. App. 822, 266 S.E. 2d 8 (1980), the defendant was charged with unlawfully burning an uninhabited dwelling pursuant to G.S. 14-62. The court held that defendant was entitled to have his motion for nonsuit granted since the evidence showed that the mobile home burned was used by three people as their place of residence, and their temporary absence at the time of the fire did not make the dwelling an uninhabited house within the meaning of the statute. "Common law arson results from the burning of a dwelling even if its occupants are temporarily absent at the time of the burning." 46 N.C. App. at 823.

In 5 Am. Jur. 2d, Arson and Related Offenses, § 17 (1962), we find: ". . . it has been held or recognized that mere temporary absence of the occupants from a house, so that at the time of its burning there was no human being in it, will not affect the character of the building as a 'dwelling'." *See Johnson v. State*, 48 Ga. 116 (1873); *State v. Warren*, 33 Me. 30 (1851); *Commonwealth v. Barney*, 64 Mass. (10 Cush.) 478 (1852); *People v. Losinger*, 331 Mich. 490, 50 N.W. 2d 137, 44 A.L.R. 2d 1449 (1951), *cert. denied*, 343 U.S. 911 (1952). In *Losinger* the cabin or cottage burned was unoccupied at the time of the fire but was occupied by the owner at frequent intervals, particularly during hunting season, and was intended to serve as the owner's home following his retirement.

We agree with the Court of Appeals and the other authorities cited that common law arson results from the burning of a dwelling even though its occupants are temporarily absent at the time of the burning.

The facts in the case at bar clearly establish that the house burned was the dwelling place of Ralph Bullins. Bullins testified that he left his house at approximately 8:30 p.m. and when he returned later that evening, around 11:45 p.m., portions of his house had been burned out. This temporary absence of the occupant did not render the premises uninhabited. All the elements of common law arson were pleaded and proved.

No error.