STATE OF NORTH CAROLINA
v.
JAMES BRADLEY HUFFMAN
No. COA05-349
North Carolina Court of Appeals
Filed February 7, 2006
This case not for publication
Forsyth County No. 03 CRS 050017.
Attorney General Roy Cooper, by Special Deputy Attorney General Susan K. Nichols, for the State.
Grace, Holton, Tisdale & Clifton, P.A., by Christopher R. Clifton and Michelle B. Clifton, for defendant appellant.
McCULLOUGH, Judge.
Defendant appeals his convictions, following a jury trial, for second-degree arson, burning of personal property, and assault on a firefighter. Finding no error, we affirm the judgments of the trial court.
The State's evidence showed the following: In the early morning of 1 January 2003, a fire destroyed a house owned by Connie Kuhn at 5205 Pine Hall Road in Walkertown, North Carolina. Kuhn purchased and started living in the house in 1991, and began dating defendant in 1993. Defendant moved into the house with Kuhn in late 1997 or early 1998, prior to the birth of their son, Bradley, in 1998. During the course of their relationship, she and defendant "had problems and [Kuhn] would move out and then move back in. Move out and move back in." Kuhn made the mortgage payments on the house and paid for all of the utilities.
In October of 2002, Kuhn ended her relationship with defendant after a heated confrontation in which he threw things at her and threatened her. Fearing for her life, Kuhn fled to her mother's residence, taking with her only a few personal effects that fit into a backpack. She and Bradley stayed with her mother, while defendant continued to live in her house. Kuhn retained a key to the house, which contained all of her and Bradley's furniture, bedding, and personal effects and most of their clothes. She took Bradley to the house to visit defendant "an hour here and an hour there." Kuhn also came back to the house on at least one occasion to obtain additional clothing for her and Bradley while defendant was at work. Kuhn received her mail at work but never submitted a change of address notice to the post office. Kuhn continued to pay the mortgage and utilities on the house, believing, "[t]hat was still my residence. I was planning on going back there." Prior to the fire, she had last visited the house in early December.
When asked if she and defendant discussed "how long [she] would allow him to remain in the residence[,]" Kuhn testified as follows:
He told me that he was going to move out. I never told him when he had to leave but he told me he was going to move out. . . . Move into his grandfather's house and then he told me he was going to move to Mississippi where his parents live.
In mid-December of 2002, Kuhn asked defendant "when he was leaving[,]" and he replied that he was moving to Mississippi. "Several days" before the fire, defendant and Kuhn again discussed when he would move out of her house and remove the furniture and other items belonging to him. Defendant told Kuhn on this occasion "that it would be easier just to torch the place than to separate the stuff or move it."
On the afternoon of 31 December 2002, defendant paid an unannounced visit to Kuhn's workplace and asked her for a hug. When she refused, he told her that she had changed and was "a cold person[.]" Defendant later made a series of "angry" telephone calls to Kuhn while she was attending a New Year's Eve party at her uncle's house. During one call, defendant said "that he moved his stuff to his grandfather's and that he would be leaving either the next day or two days later." In other calls, defendant accused Kuhn of having an affair. Several times, defendant told her "that he would end up with a new or better house before [she] would." Defendant called Kuhn a final time just after midnight on 1 January 2003, and said things that she interpreted to be "threats."
Kuhn left the party at approximately 1:15 a.m. on 1 January 2003. As she was driving to a friend's house in Kernersville, she received a phone call from a neighbor on Pine Hall Road, who told her that her house was on fire. When Kuhn arrived at the burning house, defendant was standing in a neighbor's yard. Kuhn described their ensuing exchange as follows: I asked him what happened to the house and . . . he said that I shouldn't be concerned as to what happened to the house. I should be concerned that no one got hurt. I told him that I was glad that no one got hurt but what happened to the house.
He said, again, you should just be glad that no one got hurt and I said I am happy no one got hurt but what happened to the house. His voice got really, you know, a lot sterner and he said to me you're not hearing me. You should be glad that no one got hurt. The next time you won't be so lucky.
As Kuhn walked away from defendant, he cursed at her and said that "he was going to get [her] and he would kill [her]." Defendant then called Kuhn from a cellular telephone in a fire truck and said, "All I wanted was a hug."
Forsyth County Assistant Fire Marshal Marty Whicker responded to the fire at 5205 Pine Hall Road at 2:36 a.m. on 1 January 2003. As he was speaking to Kuhn, defendant called her from the fire truck. Whicker walked over to the truck, opened the door and asked defendant if he had used the department's phone. Defendant responded, "[I]t is none of your damn business what I do." Defendant cursed Whicker and told him "I am not going to cooperate with you. I am not going to tell you a damn thing." Unable to get defendant out of the truck, Whicker sought assistance from Forsyth County Sheriff's Deputy Rick B. Rumley. Defendant was taken into custody after he pushed and shoved Rumley and challenged him to a fight. As Rumley was placing him in handcuffs, defendant turned around and kneed or kicked Whicker in the upper thigh. Defendant then screamed at Whicker, "I will find out who you are, and I willkill you and your family[.]" Kuhn later identified defendant to Whicker as her boyfriend and said "that they had had some relationship problems and that she had moved out a few months prior to the fire and given [defendant] some time to get his affairs in order and she was planning on moving back into the house."
During his investigation of the fire scene, Whicker found "unusual burn patterns on the floor, some low level burning" in the den area of the house's ground floor level. A carpet sample taken from the area was found to contain gasoline residue. Whicker also found a red plastic can containing gasoline outside of the residence next to the garage. Assisted by an accelerant-detecting canine, State Bureau of Investigation Special Agent and Certified Fire Investigator Patrick Whatley examined the remains of the house with Whicker and concluded that the fire was "incendiary or set in nature" and was caused by gasoline being "placed or poured in the lower level . . . of the structure and then set by human hand." Defendant first claims the trial court erred in denying his motion to dismiss the charge of second-degree arson, absent substantial evidence that the house at 5205 Pine Hall Road was the "dwelling of another" at the time of the fire. N.C. Gen. Stat. § 14-58 (2005). Inasmuch as the evidence showed Kuhn had not lived in the house since October of 2002, defendant argues that she was not an inhabitant of the house for purposes of the arson statute. See State v. Britt, 132 N.C. App. 173, 178, 510 S.E.2d 683, 687 ("[I]t is an essential element of the crime of arson that the burned house be inhabited."), disc. review denied, 350 N.C. 838,538 S.E.2d 571 (1999). Defendant characterizes Kuhn's relationship to the house and her behavior leading up the fire as "akin to those of a landlord who acknowledged and respected his exclusive occupancy of the house." As the sole occupant of the house, defendant insists he cannot be found guilty of arson.
In reviewing the denial of a defendant's motion to dismiss, our task is to "'determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense.'" State v. Robinson, 355 N.C. 320, 336, 561 S.E.2d 245, 255 (citation omitted), cert. denied, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002). Substantial evidence is defined as that which is "adequate to convince a reasonable mind to accept a conclusion." Id. (citation omitted).
The crime of second-degree arson denotes "the willful and malicious burning of the dwelling of another which is unoccupied at the time of the burning." State v. Hodge, 121 N.C. App. 209, 210, 465 S.E.2d 14, 15 (1995); N.C. Gen. Stat. § 14-58 (2003). As defendant challenges only the sufficiency of the evidence that the burned building was the "dwelling of another," we confine our analysis to this element of the charge.
To be a "dwelling of another" and thus subject to arson, the structure must be inhabited by a person other than (or in addition to) the defendant at the time of its burning. See State v. Ward, 93 N.C. App. 682, 685-87, 379 S.E.2d 251, 253-54, disc. review denied, 325 N.C. 276, 384 S.E.2d 258 (1989); State v. Vickers, 306N.C. 90, 100, 291 S.E.2d 599, 606 (1982) ("'[D]welling house' as contemplated in the definition of arson means an inhabited house."), overruled on other grounds by State v. Barnes, 333 N.C. 666, 678, 430 S.E.2d 223, 229, cert. denied, 510 U.S. 946, 126 L. Ed. 2d 336 (1993). The burning of an uninhabited house, or the burning of a house by its sole inhabitant, is not arson, inasmuch as "the main purpose of common law arson is to protect against danger to those persons who might be in the dwelling house which is burned." State v. Jones, 296 N.C. 75, 77, 248 S.E.2d 858, 860 (1978). As suggested above, however, the "requirement that the dwelling burned be that of 'another' is satisfied by a showing that some other person or persons, together with the defendant, were joint occupants of the same dwelling unit." State v. Shaw, 305 N.C. 327, 338, 289 S.E.2d 325, 331 (1982). Moreover, "'mere temporary absence of the occupants from a house, so that at the time of its burning there was no human being in it, will not affect the character of the building as a "dwelling"'" for purposes of the arson statute. Vickers, 306 N.C. at 99-100, 291 S.E.2d at 606 (citation omitted).
This Court has previously found "a mobile home used . . . as a weekend vacation residence" to be an inhabited "dwelling of another" for purposes of the arson statute. Hodge, 121 N.C. App. at 209-10, 465 S.E.2d at 15. Similarly, in State v. Gulley, 46 N.C. App. 822, 823-24, 266 S.E.2d 8, 9 (1980), we reversed a defendant's conviction for the crime of burning an uninhabited house under N.C. Gen. Stat. § 14-62, upon evidence that the occupants of the house were only temporarily absent over the Thanksgiving weekend. "Since a dwelling which is merely temporarily unoccupied falls within the definition of arson" under N.C. Gen. Stat. § 14-58, we concluded "that the legislature meant something more than the temporary absence of the occupants" when it created a separate offense applicable to "uninhabited" houses under N.C. Gen. Stat. § 14-62. Gulley, 46 N.C. App. at 823, 266 S.E.2d at 9. In Vickers, the Supreme Court cited favorably the case of People v. Losinger, 331 Mich. 490, 50 N.W.2d 137 (1951), cert. denied, 343 U.S. 911, 96 L. Ed. 1327 (1952), which affirmed an arson conviction upon evidence that "the cabin or cottage burned was unoccupied at the time of the fire but was occupied by the owner at frequent intervals, particularly during hunting season, and was intended to serve as the owner's home following his retirement." Vickers, 306 N.C. at 100, 291 S.E.2d at 606.
In contrast to these cases, we have found a trailer uninhabited, and thus not covered by the arson statute, where it had been "permanently abandoned" by its erstwhile occupant at the time of the fire. Ward, 93 N.C. App. at 685-87, 379 S.E.2d at 253-54. In Ward, Lori Mayse was living in the trailer with her husband when she arranged for defendant to kill her husband and dispose of the body. After she had committed the murder, she paid defendant $50 to burn down the trailer. In finding the trailer uninhabited, we first found that the husband's death terminated his status as an inhabitant. We then pointed to "the undisputed evidence . . . that Lori Mayse had ceased to inhabit the trailer at the time it was burned." Id. at 687, 379 S.E.2d at 254. We noted she "had shut off electric power to the trailer and was living elsewhere[,]" and that she had consented to or actively arranged the burning. Id. at 686, 379 S.E.2d at 254. Such actions, we concluded, were "certainly evidence of [her] intention not to return to the trailer." Id.
Based on the relevant authority, we find substantial evidence to support the jury's finding that the house at 5205 Pine Hall Road was inhabited by Kuhn at the time of its burning on 1 January 2003. Although Kuhn was temporarily absent from her house pending defendant's departure, she considered it to "still [be her] residence . . . [and] was planning on going back there." Unlike the former occupant in Ward, Kuhn's actions in no way evinced an intent to abandon the house. She continued paying the mortgage and utilities, did not change her mailing address, and kept virtually all of both her and her son's possessions there. She also retained a key to the house which she used at her pleasure and returned there from time to time to gather her belongings. Moreover, Kuhn had ongoing discussions with defendant about his departure and had been told by defendant on the day before the fire that he was moving out of the residence within a day or two. Unlike a landlord who leases a dwelling to a tenant, Kuhn's absence from her home was based upon her fear of defendant, not upon her recognition of any contractual or legal right to his exclusive occupancy of the house. Accordingly, we overrule this assignment of error.
Defendant next asserts that the trial court erred by refusing to allow him to cross-examine Kuhn about her alleged romantic affair with Tom Goco. On voir dire, Kuhn acknowledged that Goco's wife called Kuhn at some point after the fire and accused her of having an affair with Goco. Defendant asserts that he had a right under N.C.R. Evid. 401 and the Confrontation Clause to elicit testimony from Kuhn tending to show "that someone other than the defendant had an opportunity or motive to commit the act in question[.]"
"[I]t is well settled that 'to be both relevant and admissible, evidence tending to show the guilt of one other than the defendant must point directly to the guilt of a specific person or persons.'" State v. Hester, 343 N.C. 266, 271, 470 S.E.2d 25, 28 (1996) (quoting State v. Larrimore, 340 N.C. 119, 144, 456 S.E.2d 789, 802 (1995)). To be allowed into evidence under N.C.R. Evid. 401, "'such evidence must tend both to implicate another and be inconsistent with the guilt of the defendant.'" State v. Williams, 355 N.C. 501, 532, 565 S.E.2d 609, 628 (2002) (quoting State v. Cotton, 318 N.C. 663, 667, 351 S.E.2d 277, 279-80 (1987)), cert. denied, 537 U.S. 1125, 154 L. Ed. 2d 808 (2003). Here, defendant's offer of proof failed to produce any evidence directly inculpating Goco or his wife in the arson. Evidence of their potential motive to harm Kuhn was thus inadmissible and was properly excluded by the trial court. We note that defendant failed to raise his constitutional claim in the trial court, as required to preserve the issue for appellate review.State v. Braswell, 312 N.C. 553, 558, 324 S.E.2d 241, 246 (1985). No error.
Judges TYSON and ELMORE concur.
Report per Rule 30(e).